**In the Matter of the APPLICATION OF Barbara A. ORR to Place Structures in Mille Lacs Lake.**

**No. C6–86–1036.**

Court of Appeals of Minnesota.

Nov. 25, 1986.

Hubert H. Humphrey, III, Atty. Gen., Donald A. Kannas, Sp. Asst. Atty. Gen., St. Paul, for respondent DNR.

William G. Peterson, William Peterson & Associates, Ltd. Bloomington, for relator Barbara Orr.

Considered and decided by POPOVICH, C.J., and PARKER and HUSPENI, JJ., with oral argument waived.

## OPINION

HUSPENI, Judge.

This is an appeal from an administrative decision denying Barbara Orr's request to construct a breakwater/harbor in Mille Lacs Lake adjacent to her campground. Orr claims the Minnesota Department of Natural Resources (DNR) erred when it rejected the findings of the Administrative Law Judge (ALJ), that the DNR's findings are not supported by substantial evidence and that its decision is arbitrary and capricious and based on an impermissible moratorium policy. We reverse and remand with instructions to grant relator a permit to construct the proposed breakwater.

## FACTS

Relator Barbara Orr owns Orr's Campground and Resort near the town of Malmo on the northeast shore of Mille Lacs Lake. The resort consists of 13 acres with approximately 350 feet of shoreline and includes 120 mobile home and camping sites. At times, as many as 200 boats are docked at Orr's.

Orr maintains two 150 foot long permanent docks. In addition, 80 wooden mooring posts are placed in the vicinity of the

docks about 40 feet apart. Boats are tied to posts when docking space is unavailable. Boats are launched from a concrete boat ramp using a four-wheel drive vehicle. Often the ramp is sand-clogged because of winds and lake bed movement.

Orr seeks a permit to construct a rock, horseshoe-shaped breakwater to form an in-lake harbor. The breakwater would be about 90 feet on each side and 120 feet parallel to the shore, and would extend two feet above the ordinary high water mark. The area in which Orr proposes to build the breakwater is shallow; and the breakwater would not impede navigation.

Orr claims the project will result in a safer harbor. Because of the high winds and choppy water in the bay area, all boats must be removed from the water when a storm approaches. She testified that storms have grounded and damaged as many as 50 boats at her shore at one time. Boaters have also been injured in attempts to land at the resort. During the 1985 fishing season at least 12 strong storms hindered boat retrieval.

Mille Lacs Lake is a large, shallow lake of about 200 square miles with a controlled water level. It is one of the most productive walleye lakes in the state and an important recreational resource. Although fishing pressure is intense, walleye population is as high as it has ever been and seems to be at the maximum number. There are also "rough fish" in the lake (specifically carp and bullhead) which can be harmful to walleye production if they exist in excessive numbers. There was testimony at the hearing before the ALJ that carp are not currently a problem.

The offshore area adjacent to the resort is not a walleye spawning area or habitat. Evidence was submitted to show that the breakwater will not significantly increase the rough fish population if subsurface vegetation is not permitted to root or if it is removed.

In October 1984, the DNR area fisheries supervisor visited Orr's Resort, reviewed the breakwater plans and reported that there would be no adverse impact on fisher-ies if certain modifications were made to the plan. In December 1984, the Army Corps of Engineers approved the proposed breakwater project, finding it would not adversely affect the walleye population of Mille Lacs Lake. In April 1985, the DNR denied Orr's application, stating that the breakwater/harbor is inconsistent with the agency's rules and would create a calm water area which would "substantially alter the character of the lake * * * promoting rough fish reproduction and adversely affecting game fish."

A contested case hearing was held before an ALJ, at which time there was testimony from representatives of the DNR, the Army Corps of Engineers, and U.S. Fish and Wildlife Service. Testimony of witnesses was based on their previous reports. Orr testified that in the summer of 1983 she asked the DNR and Corps of Engineers representatives for suggestions on how to alleviate the harbor problem at her resort. "They suggested a breakwater," she said, and added the DNR told her that no inland harbors would be allowed.

Michael O'Keefe, an Army Corps of Engineers ecologist, testified that an inland harbor was not a viable alternative for Orr's Resort. He also said the offshore area adjacent to Orr's property is not a walleye spawning area and would not be well-suited for carp reproduction because of its lack of vegetation and food. O'Keefe testified that a breakwater would increase recreational opportunities, be more aesthetic and improve safety for boaters. He conceded that "there might be a mild long-term effect on water quality."

Howard Christman, DNR area hydrologist, said he recommended denial of the permit because it is inconsistent with DNR rules, specifically Section 6115.0210(3)(b), which prohibits placement of structures "detrimental to significant fish and wildlife habitat * * * and. there is no feasible, practical or ecologically accepted means to mitigate the effects." The DNR last issued a harbor permit in 1970, and claims none applied for since that time has complied with DNR rules.

Richard Hassinger, DNR Fisheries Chief, Division of Fish and Wildlife, testified that the department's main concern with construction of the proposed breakwater is the creation of additional habitat for carp and bullheads, to the detriment of walleye. However, he said, "[T]hose species are not at high abundance at the present time." He added that recent catches indicate some increase in the bullhead and carp population.

Upon further questioning about DNR fish reports, Hassinger stated that those reports do not refer to rough fish as a problem in the lake because there is no habitat for them. "At the present level of habitat they (rough fish) are not a problem." Hassinger testified that Orr's project would not significantly increase carp population in Mille Lacs Lake, although if other harbors are added, they could cumulatively harm the lake.

In March 1986, the ALJ recommended that the DNR grant the permit conditioned on: (1) constructing culverts in the wall of the breakwater to permit adequate water movement; (2) removal of aquatic vegetation from the sheltered area; (3) installation of navigational lights on the structure; and (4) placement of sand removed during construction in a way that would deter erosion.

The ALJ concluded that Orr's plan complied with the requirements of Minn.Rule 6115.0210(3)(b) and would not have any significant impact on any particular walleye habitat or on the presence of rough fish in the lake. In his findings, the ALJ noted that "[t]here is no evidence in the record regarding the additional quantity of rough fish that would be introduced into Lake Mille Lacs as a consequence of the Orr project." The ALJ also concluded that an alternative dock or inland harbor at Orr's Resort is not feasible and modifications to the original plan would mitigate any potential adverse effect.

The ALJ's findings and conclusions further noted that the DNR has never studied the effect of inland harbors, even though they expressed an intent to do so. Further, the ALJ found that the DNR's unofficial policy of not allowing additional inland harbors or structures in the lake was not promulgated as a rule under the Administrative Procedures Act (APA).

In May 1986, the DNR Commissioner denied Orr's request for a breakwater. Although adopting many of the ALJ's findings, the Commissioner disagreed with the ALJ's recommendations and determined:

> The harbor will make a rough fish breeding ground out of an area that is not such now. Those rough fish will reduce the primary food sources of the walleye.
>
> It will increase the carp and bullhead population of the lake.

The Commissioner concluded that more harbors on Mille Lacs Lake will be detrimental to walleye habitat, and authorized construction of short breakwaters on both sides of the launch ramp to alleviate the problem at Orr's Resort.

## ISSUES

1. Is the agency's decision to deny Orr's request to construct a breakwater in Mille Lacs Lake supported by substantial evidence?

2. Is the agency's decision arbitrary and capricious?

3. Did the agency deny Orr's permit application based on an unpromulgated rule in violation of the APA?

## ANALYSIS

The APA, Minn. Stat. § 14.63—.69 (1984), governs judicial review of an administrative agency decision. An appellate court may reverse the agency's decision if it is unsupported by substantial evidence of record or if the court finds it is arbitrary and capricious or affected by other errors of law. Minn. Stat. § 14.69 (1984).

Orr's permit application is governed by Minn. Stat. § 105.45 (1984), which requires DNR permission before construction in Minnesota public waters. This statute provides:

If the commissioner concludes that the plans of the applicant are reasonable, practical, and will adequately protect public safety and promote the public welfare, he shall grant the permit * * *. In all other cases the commissioner shall reject the application or he may require such modification of the plan as he deems proper to protect the public interest. In all permit applications, the applicant has the burden of proving that the proposed project is reasonable, practical and will adequately protect the public safety and promote the public welfare. In granting a permit the commissioner may include therein such terms and reservations with respect to the amount and manner of such use or appropriation or method of construction or operation of controls as appears reasonably necessary for the safety and welfare of the people of the state.

Minn.Stat. § 105.45.

Such a project must also comply with DNR water regulations. *See* Minn. Rules 6115.0200, 6115.0210, 6115.0211. The main concern here is under Minn. Rule 6115.-0210, subpt. 3 which provides:

Placement of structures shall not be permitted where the structure:

* * * * * *

B. Will be detrimental to significant fish and wildlife habitat, or protected vegetation. * * *

Minn. Rule 6115.0211, subpt. 4 provides that permits to construct breakwaters may issue only on condition that:

A. Alternative dock or inland facilities are infeasible.

## I.

■ Orr contends the Commissioner's decision is not supported by substantial evidence. "Substantial evidence" is:

1. Such relevant evidence as a reasonable mind might accept as adequate to support a conclusion;
2. More than a scintilla of evidence;
3. More than 'some evidence';
4. More than 'any evidence'; and

5. Evidence considered in its entirety. *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 825 (Minn.1977). Using this test the reviewing court is to evaluate the evidence considering the entire record, and must affirm if the agency engaged in reasoned decision making. *Id.*

Orr argues that she has borne her burden of proof and met the requirements to obtain the permit. She cites the full ecological review by the Army Corps of Engineers and statements in DNR documents that her project would not threaten the walleye fishery of Mille Lacs Lake. The DNR Commissioner's major thrust in response is that the harbor will make a rough fish breeding ground, reduce the primary food source of the walleye, be detrimental to significant fish and wildlife habitat, and will constitute a harmful precedent making it impossible to deny future harbor requests. In the memorandum attached to his order, the Commissioner states in part:

There is no question that the Orr operation would be well served by a more sheltered boat launch and mooring facility. On stormy days, the Orrs and their customers have their work cut out for them in launching and retrieving boats. * * * I believe * * * [my findings] more accurately reflect the record on the fisheries impact issue than did those of the Administrative Law Judge. The harbor will make a rough fish breeding ground out of an area that is not such now. Those rough fish will reduce the primary food sources of the walleye.

This detrimental impact cannot be overlooked because it is not "significant". * * * We very seldom review a project that in and of itself will make a major dent in a natural resource. There is nothing unique to this particular hearing about the cumulative effects concern. It is always the concern. It is the reason the rules exist.

The basis of the Commissioner's order rests on the anticipated cumulative harmful effects of future breakwater projects, not the harmful effect of existing harbors or of the breakwater Orr would construct.

We believe, however, that the focus of the ALJ's findings is the proper one, and that those findings are supported in the record. DNR officials testified that rough fish habitat in the lake is not currently a problem and Orr's structure would not threaten walleye fishing. Documentary evidence does not support the conclusion that the potential slight increase in carp and bullhead population resulted from previously developed harbors. In fact, there is contradictory evidence showing that even if the increase in rough fish can be attributed to the harbors, it has no effect on walleye population.

The record reveals that walleye population on Mille Lacs Lake is at an all time high. Further, the Commissioner ignored the mitigating procedures that Orr agreed to use to insure that the breakwater does not promote a rough fish habitat.

Although there may be "some" evidence tending to support the Commissioner's decision, it is not sufficient to meet the substantial evidence standard. Further, much of the concern expressed by the Commissioner on appeal appears to arise from the expected increase in applications from other property owners who wish to construct breakwaters and would argue if Orr's permit is granted that they are "similarly situated" and, thus, are entitled to permits also. *See Northwestern College v. City of Arden Hills*, 281 N.W.2d 865, 869 (Minn. 1979). However, future applicants would not be "similarly situated" to Orr geographically, nor even temporally. There was uncontradicted evidence here that no walleye spawning grounds were nearby the proposed breakwater. Applicants seeking breakwaters in more leeward areas of the lake would not be able to document the valid concerns for safety of person and property that Orr has shown. This court has refused to recognize the precedential value of the action as a reason to deny an otherwise valid permit application. *Odell v. City of Egan*, 348 N.W.2d 792, 797 (Minn.Ct.App.1984). Finally, although DNR representatives discussed a formal study of the effect of harbors on rough fish production, there is no evidence of the

study in the record. In fact, the ALJ found that "although indicating an intention to do so, the Department has never undertaken a study of the effect of inland harbors and inlake structures on the walleye population of the lake." It seems elementary that such a study would be valuable to the Commissioner to indicate that which he failed to indicate here, to wit: that the proposed breakwater "will be detrimental to significant fish * * * habitat."

## II.

The ALJ found that none of the conditions in Minn. Rule 6115.0210, subpt. 3, prohibiting placement of structures, had been established. His conclusion was supported by detailed findings based on evidence of record. The Commissioner's only explanation for deviating from the ALJ's findings is "I believe [my findings] more accurately reflect the record on the fisheries impact * * *."

Although an agency is not bound by a hearing examiner's findings, they should not be taken lightly. *Beaty v. Minnesota Board of Teaching*, 354 N.W.2d 466, 472 (Minn.Ct.App.1984). Failure to explain on the record its reason for deviating from an ALJ's finding can be evidence of an arbitrary decision. *Id.*

In this case, the Commissioner's decision must be classified as arbitrary. The DNR's own experts stated that Orr's project would have no effect on walleye habitat. In addition, the Commissioner ignored steps suggested by the ALJ which would adequately mitigate the harmful effects of vegetation growth.

We again note the Commissioner's overriding concern with the precedential effect of granting Orr's requested permit. The Commissioner's arguments as to the cumulative adverse environmental effects of the proposed breakwater are not directed at the effect of adding Orr's breakwater to those already existing. Those arguments are directed instead to "subsequent harbors." We cannot approve this type of speculative approach, and find it to contrib-

ute to the arbitrariness of the Commissioner's decision.

### III.

The DNR adopted an unofficial moratorium on harbor development in Mille Lacs Lake around 1970. It concedes that no harbor permits have been issued since that time. Orr argues that denial of her permit application based on this moratorium constitutes illegal rule-making.

The ALJ agreed with Orr and found that DNR imposition of an unofficial moratorium on future lake development without demonstrating an impact on the lake's fish resources is an invalid, unpromulgated rule. The ALJ also noted that by placing Mille Lacs Lake in a "no build" status, the DNR is abrogating its existing rules relating to placement of structures in public waters. Courts have disapproved of moratoriums enacted to suspend application of an existing statute or ordinance. *Ostrand v. Village of North St. Paul,* 275 Minn. 440, 147 N.W.2d 571 (1966). We believe this disapproval applies also to agency rules.

■ An agency cannot institute an absolute moratorium by consistently denying a permitted activity under its rules without first engaging in rule-making procedures. Rules adopted without compliance with notice and comment procedures established by Minn. Stat. §§ 14.14–.20 (1980) are invalid. *See White Bear Lake Care Center v. Minn. Dept. of Public Welfare,* 319 N.W.2d 7, 9 (Minn.1982).

The DNR contends it did not apply a no-harbors rule to this case because it thoroughly discussed the merits of Orr's proposal. However, the DNR states in its brief:

Once the department became aware of the rough fish problem (which would be exacerbated wherever in the lake a new harbor was located), it has applied existing rules as described above to the factual situation and determined that any harbor would be detrimental under the existing conditions at Mille Lacs.

■ By fifteen years of consistent application of a rule which serves to deny a permitted act, the DNR has in effect enacted a permanent moratorium on harbor construction. This moratorium changes the current rule with respect to Mille Lacs Lake and a new regulation emerges that falls within the statutory definition of a rule.

"Rule" means every agency statement of general applicability and future effect, including amendments, suspensions, and repeal of rules, adopted to implement or make specific the law enforced or administered by it or to govern its organization or procedure.

Minn. Stat. § 14.02, subd. 4 (1984). In the case of the moratorium on Mille Lacs Lake harbors, the DNR adopted a blanket rule that no harbors would be granted even where an applicant complied with all conditions contained in current rules governing the request.

We are not insensitive to the DNR's argument that unchecked construction of harbors and breakwaters could harm the walleye fishing on Mille Lacs Lake. We acknowledge that at some point additional harbors and/or breakwaters may not be permitted. However, there must be a conclusive study of harbors and breakwaters and their effect on rough fish habitat and proper rule-making action before such a policy is enacted.

### DECISION

The Commissioner's decision is not supported by substantial evidence and is arbitrary and capricious. The DNR improperly adopted a moratorium on harbor development. The case is remanded to the DNR to issue the proper permits authorizing Orr to construct the proposed breakwater/harbor in Mille Lacs Lake.

Reversed and remanded with instructions to grant relator a permit to construct the proposed breakwater.