The DEPARTMENT OF HUMAN
SERVICES OF the STATE OF
MINNESOTA, Respondent,

v.

MURIEL HUMPHREY
RESIDENCES, Relator.

No. CX–88–1920.

Court of Appeals of Minnesota.

Feb. 28, 1989.
Review Denied April 26, 1989.

which required appellant to repay $32,-617.33. We reverse.

## FACTS

The federal Medicaid or Medical Assistance program is established under Title XIX of the Social Security Act, 42 U.S.C.A. § 1396 et seq. (1983). The purpose of the program is to provide medical and related care to needy persons. The Medicaid program is jointly funded by the state and federal governments, and its administration is subject to both state and federal law and regulations.

Minnesota's Medical Assistance program is administered by the Department of Human Services (DHS). Minnesota has elected to provide a full range of services, many of which are optional under federal law. One such optional service is residential care for mentally retarded persons. Under federal law, each state establishes its own system for reimbursing intermediate care facilities for the mentally retarded ("ICFs/MR") for the cost of providing care to medical assistance recipients. Relator, Muriel Humphrey Residences (MHR), is an ICF/MR.

Louise Whitbeck Fraser Community Services, Inc., is a non-profit corporation that serves the educational needs of developmentally handicapped children and adults. The organization started as a home school in 1935, and currently has three major divisions, one of which is MHR. The MHR division was established in 1976. It is composed of three homes on a three-acre site in Eden Prairie. Each of the homes holds 12 residents. The three homes are operated as one facility.

Wayne G. Faris, John M. Stoxen, Oppenheimer, Wolff & Donnelly, St. Paul, for respondent.

Ronald L. Haskvitz, Joel W. Lavintman, Smith Juster Feikema Malmon & Haskvitz, Minneapolis, for relator.

Heard, considered, and decided by CRIPPEN, P.J., and RANDALL and STONE, JJ.*

## OPINION

RANDALL, Judge.

Appeal from an order of the Commissioner of the Department of Human Services

In 1977, the Minnesota Department of Public Welfare licensed MHR to provide residential care and services for 36 mentally retarded males and females, ages 16 and over. At the same time, the Minnesota Department of Health certified MHR for 36 Title XIX intermediate care beds.

When MHR first applied for funding through the State Medical Assistance Plan,

---

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 2.

it was referred to Thomas L. Neumann, who at the time was an auditor with the Department of Public Welfare, the predecessor of DHS. Mr. Neumann assisted MHR in the preparation and completion of the forms necessary to acquire its interim financing rate, and later its per diem rate. During its years of operation, MHR regularly contacted Mr. Neumann to resolve questions relating to its funding through the State Medical Assistance Program. MHR came to rely on Neumann as an advisor on funding matters when dealing with DHS.

In 1980, at the suggestion of Virginia Presley of DHS, MHR agreed to change its licensing. Presley suggested that MHR change from having one license for a three-unit 36–bed facility, to having separate licenses for each of the three 12–bed housing units which comprised MHR. Various reasons were given as to why MHR should consider the change. The primary reasons were that in the event of a fire or the outbreak of a communicable disease in any one of the buildings, all MHR beds would have to be shut down if the facility had only one license. If each house were licensed separately, such an occurrence in one house would not require closing the two that were unaffected.

MHR representatives were concerned about whether a change in licensing would affect its funding or funding requirements. For the answer to this question, Dr. Robert Kowalczyk, MHR's Executive Director, testified that he contacted Thomas Neumann. Dr. Kowalczyk described the proposed licensing change to Mr. Neumann and asked whether such a change would have any effect on MHR's funding or funding requirements. Kowalczyk testified that Neumann's response was that there would be no change. He told Dr. Kowalczyk that funding would continue on the basis of one 36–bed facility; that MHR could continue to file only one cost report; that the change was for licensing purposes only; and there would be no financial impact at

all. This information provided by Neumann turned out to be incorrect.

MHR's funding was based, in part, on per diem payments received from DHS and, in part, on payments MHR received for "reserved-bed days."[1] To determine the per diem rate, DHS rules require an ICF/MR to submit an annual cost report to the Department. The report includes information relevant to the facility's operational costs. The DHS then determines the facility's payment rate based on the Department's review of the cost reports. Once a facility's rate is established, it bills the Department on a monthly basis for the number of days of patient-residence during the previous month. In a 30–day month, a 12–bed facility with full occupancy would bill for 360 days of reimbursement at the predetermined per diem rate.

Minnesota is one of many states that has chosen to pay ICFs/MR for reserved-bed days. Payment of reserved-bed days is for the benefit of residents. Its purpose is to ensure that the resident will be able to return to the same bed and not be faced with the disruption of moving to another bed upon return to the facility.

The Department has developed a reserved-bed days policy that pays for reserved-bed days only when facilities operate above certain occupancy levels. When occupancy is low, the likelihood that a resident would be unable to return to his or her same bed is minimal. Thus, facilities must have a certain occupancy level in order to qualify for payment for reserved-bed days. The level set by the state is 93 percent for facilities with more than 24 beds. Facilities with 24 or fewer beds may claim reserved-bed days *only* if they have not had a certified bed vacant within that facility for an entire month. In the billing process, a facility may claim reimbursement for its eligible reserved-bed days. The billing process for reserved-bed days is separate from the process of establishing a facility's per diem rate.

At the administrative hearing, Neumann testified that he was unaware of the 24–

---

1. "Reserved-bed days" are days in which a Title XIX Medical Assistance-paid resident is absent

from the facility for hospitalization, theraputic leave, or camp leave.

bed or less exception to the 93 percent rule when he advised MHR that its funding would not be affected. Neumann testified that he "vaguely" recalled discussing the issue of a change in licensing for MHR, but had no specific recollection of the conversation. He could not remember talking to representatives of MHR about the effect the licensing change would have on its funding. Neuman also testified that he could only recall "bits and pieces" of his 1980 conversation with Kowalczyk.

Later, on direct examination, Neumann testified that he had "conversations" with MHR, without specifying with whom. According to his testimony, he specifically remembered discussing per diem rate calculation only. Later he testified, regarding the 93% cut-off rate and the 24 or less cut-off rule, that " * * * I don't remember specifically talking with them about, I guess, the particular issue at hand * * *."

At the time of his 1980 conversation with Neumann, Kowalczyk was aware of the state's policy of funding reserved-bed days only when minimum occupancy levels were met. Kowalczyk had received and read a 1978 Medical Assistance provider bulletin describing State Plan requirements for reserved-bed day reimbursement. The bulletin was mailed to all ICF/MR providers to explain the reserved bed day payment plan. Regarding reimbursement based on facility size and occupancy, the bulletin states:

> If the monthly average for the full month occupancy was 93% or higher (not rounded), the facility may claim reserved bed days for that month if the other criteria is met.
>
> *Note:* Facilities with 24 or less certified beds may claim reserved bed days provided that they have not had a certified bed vacant for the entire month.

The bulletin also provided telephone numbers for questions about reserved-bed day procedures and included examples of how reserved-bed day payments should be calculated by providers.

After Kowalczyk's discussion with Neumann, MHR changed its licensing. Instead of being licensed as one 36–bed provider, it became three 12–bed providers. Despite the licensing change, MHR continued to submit one cost report to DHS with its approval. Neumann testified that he told Kowalczyk that it would be administratively easier for DHS to process a single MHR report, although MHR now would technically be three separate providers.

MHR had a policy of keeping one bed open in each of the three units as a "respite" bed. These beds were provided as a service to the community so that MHR could receive emergency county referrals, accommodate visitors, and provide a bed for future patients who chose to visit MHR and acclimate themselves to the facility prior to establishing residence. Steven Naill, Whitbeck's director of residential services, testified that the county strongly encouraged MHR to keep a respite bed open to provide for emergency placements.

MHR's good faith respite bed policy caused it to violate the DHS rule requiring facilities of 24 or less beds to have no beds vacant for the entire month in order to claim reimbursement for reserved-bed days.[2]

Thomas Neumann, who previously had been responsible for calculating per diem rates for providers, became an investigator for the Surveillance and Review System of DHS in 1982. Kowalczyk had heard, through a network organization in which MHR was active, that DHS was auditing providers to determine compliance with the "93%/24 or less" rule. In 1986, he directed Naill to meet with Neumann to determine whether MHR would be audited. Naill testified that he left this meeting confused about MHR's eligibility for reserved-bed day reimbursements and uncertain of its compliance with DHS regulations. Neumann, MHR's original advisor, then instituted an audit of MHR and determined that MHR violated the 24 or less rule, and that for the period of the audit, 1983–86, MHR

---

**2.** We note it was stipulated at the hearing that, overall, MHR did not fall below the 93% occupancy rate between July 1983 and February 1986. Had MHR been licensed as one facility, as it was before the DHS requested change, it would not have violated DHS policy.

had overbilled DHS approximately $32,-837.17. This amount was later reduced to $32,617.33 because of recalculation. This "overbilling" represented charges for 616 reserved-bed days. DHS does not claim that MHR had fraudulently or intentionally overbilled the state, but argues good faith inadvertence is no defense.

Neumann, on behalf of DHS, requested reimbursement of the $32,837 pursuant to Minn.Stat. § 256B.064, subd. 1a (1986), by filing a Notice of Agency Action on May 1, 1986. MHR appealed the Notice of Action and a contested case hearing was convened on November 25, 1987.

On February 4, 1988, the Administrative Law Judge (ALJ), Peter Erickson, issued his findings of fact, conclusions of law and recommendation, holding that DHS was equitably estopped from enforcing the 24-bed or less rule against MHR because of its representation to MHR that changing its licensing would not affect its funding, a representation upon which MHR reasonably relied.

DHS filed exceptions to the ALJ's report with the Commissioner of DHS. On August 10, 1988, the Commissioner issued an order reversing the ALJ and requiring MHR to repay the amounts overbilled.

MHR filed a petition for review of the Commissioner's decision. We granted review and now reverse the Commissioner.

## ISSUES

1. Are the Commissioner's factual findings supported by substantial evidence in view of the entire record?

2. Did the Commissioner err, as a matter of law, by concluding that the agency was not equitably estopped from recovering the overpayments?

## ANALYSIS

### Standard of Review

This court's review of this case is governed by Minn.Stat. § 14.69 (1986) which provides:

In a judicial review under sections 14.63 to 14.68, the court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusion, or decisions are:

(a) In violation of constitutional provisions; or

(b) In excess of the statutory authority or jurisdiction of the agency; or

(c) Made upon unlawful procedure; or

(d) Affected by other error of law; or

(e) Unsupported by substantial evidence in view of the entire record as submitted; or

(f) Arbitrary or capricious.

MHR argues that the Commissioner's decision should be reversed because her findings are unsupported by substantial evidence, her decision was arbitrary and capricious, and affected by other error of law. We agree.

## I.

### The Substantial Evidence Test

An agency's factual findings are reviewed under the "substantial evidence" test. *Taylor v. Beltrami Electric Cooperative, Inc.*, 319 N.W.2d 52, 56 (Minn.1982). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion * * *." *Reserve Mining Company v. Herbst*, 256 N.W.2d 808, 825 (Minn.1977).

A review of the entire record is required because evidence which might be conclusive if unexplained, may lose all probative force when supplemented or explained by other testimony. *Liffrig v. Independent School District No. 442*, 292 N.W.2d 726, 729 (Minn.1980) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–88, 71 S.Ct. 456, 463–65, 95 L.Ed. 456 (1951)). We will not uphold an agency's decision on the basis of evidence which, in and of itself justifies that decision, without taking into account contradictory evidence or evidence from which conflicting inferences can be drawn. *Id.* at 729. When this court determines that an

agency's decision is not supported by substantial evidence, we will reverse or modify that decision. *Brinks, Inc. v. Minnesota Public Utilities Commission,* 355 N.W.2d 446 (Minn.Ct.App.1984).

Therefore, we analyze the Commissioner's amendment of the ALJ's factual findings under the substantial evidence test to determine whether the amendments are supported by the record.

### A. *ALJ Finding Number Three*

■ MHR argues that the Commissioner's amendment of the ALJ's finding number three is not supported by substantial evidence. The ALJ found:

> In considering whether to make the licensure change, MHR was concerned about whether its funding would be affected. Consequently, MHR, through its Director of Residential Services, Steven Naill, and its Executive Director, Dr. Robert Kowalczyk, contacted Thomas Neumann, an auditor at the Department of Human Services, whom they had consulted in the past for answers to questions relating to funding and funding requirements. After the proposed change in licensure was explained to Mr. Neumann, he advised MHR that it would have no effect on its level of funding. Neumann further stated that MHR could continue to file only one cost report rather than a separate cost report for each licensed facility. At the time this advice was given, Mr. Neumann was not aware of the 24–bed–or–less exception to the 93 percent occupancy rule. He did not become aware of this provision until 1984.

The Commissioner found:

> In considering whether to make the licensure change, MHR was concerned about whether its funding would be affected. Consequently, MHR, through its Director of Residential Services, Steven Naill, and its Executive Director, Dr. Robert Kowalczyk, contacted Thomas Neumann, an auditor at the Department of Human Services, whom they had consulted in the past for answers to questions related to their per diem reimbursement rate. They orally discussed the proposed change in licensure and Mr. Neumann advised MHR that it would have no effect on its level of funding. Neumann further stated that MHR could continue to file only one cost report rather than a separate cost report for each licensed facility. At the time this advice was give [sic], Mr. Neumann was not aware of the different occupancy rate requirements for reserved bed reimbursement between facilities with fewer or more than 24 beds. His expertise was in the area of rate reimbursement. He did not become aware of this provision until 1984.

(Underlined material represents amended areas.)

The Commissioner significantly narrowed the scope of Naill and Kowalczyk's conversations with Neumann. DHS argues that this amendment is immaterial and harmless, and that the Commissioner's finding of no estoppel does not hinge on this finding. However, *if* MHR had asked Neumann questions regarding per diem rates only, then MHR could not claim that it *reasonably* relied on that advice because such advice would not govern the application of the 93% or 24 or less rule—a separate but related funding matter. Therefore, the Commissioner's amended finding is not immaterial.

DHS further argues that the amendment is rooted in the record since per diem rate funding is Neumann's responsibility, a fact judicially noticed by the Commissioner. Yet, whether per diem rate funding is in Neumann's area of expertise is not directly relevant to the issue of whether he, in 1980, made a specific representation to MHR that its funding would not change. At best, one might infer that because per diem rates were familiar to Neumann, that Neumann may have limited his representations to MHR to that subject matter. Nevertheless, this inference alone does not support the Commissioner's finding.

DHS argues that Neumann did testify to discussing per diem rates with Kowalczyk. MHR more correctly points out that Neumann testified to only a "vague" recollection of "bits and pieces" of his conversa-

tions with Kowalczyk and Naill. Furthermore, Neumann testified that he did not remember discussing the "specific issue" of the applicability of the rules at issue. Neumann testified that his "conversations" were confined to per diem rate issues. Yet, Neumann could not recall with whom he discussed these issues. Therefore, based on Neumann's testimony, it is doubtful whether a reasonable mind could infer that Neumann limited his discussions with Kowalczyk and Naill to per diem rates when he stated that he remembers only "bits and pieces" of this specific 1980 conversation.

Assuming that Neumann's testimony as to "conversations" with MHR in itself could justify the Commissioner's finding, *Liffrig* requires this court to consider Kowalczyk's testimony as well. Kowalczyk testified that Neumann specifically told him that MHR's funding would not change. Kowalczyk also testified that the 93% rule was discussed. Had Neumann testified that he did *not* tell Kowalczyk that MHR's funding would remain constant, then it would be his word against Kowalczyk's, and reasonable inferences could be drawn both ways. Neumann could not so testify.[3] Based on the entire record, the Commissioner's amended finding that Neumann *only* discussed per diem rates is unsupported by substantial evidence. In fact, to the contrary, substantial evidence supports the ALJ's finding that Neumann told Kowalczyk in general terms that MHR's funding would not change.

### B. *ALJ Finding Number Four*

■ Next, MHR challenges the Commissioner's amended finding number four. The ALJ found:

> After speaking with Mr. Neumann, MHR made the decision to change its licensure status from one, 36–bed facility to three, 12–bed facilities. From February, 1980

through the present, each of the facilities which comprise the Muriel Humphrey Residences has been licensed as a separate, 12–bed ICF/MR. MHR has continued to submit one cost report, rather than three, for the three licensed facilities and has been operated in all meaningful respects as one facility providing intermediate care.

The Commissioner's amended finding reads:

> After speaking with Mr. Neumann, MHR made the decision to change its licensure status from one, 36–bed facility to three, 12–bed facilities. From February, 1980, through the present, each of the facilities which comprise the Muriel Humphrey Residences has been licensed as a separate, 12–bed ICF/MR. MHR has continued to submit one cost report, rather than three, for the three licensed facilities but has submitted three separate provider agreements for the three facilities.

(Underlined material represents amended areas).

MHR disputes respondent's contention that this amendment is "innocuous." MHR claims that even though it submits three provider agreements, DHS treats it as a single entity. However, DHS is correct in stating that the Commissioner's amendment is supported by the parties' stipulation. MHR may draw different *inferences* from this amended finding, but points to no evidence suggesting that the finding is unsupported by substantial evidence. We conclude that the Commissioner's finding number four is supported by substantial evidence and will be accepted.

### C. *ALJ Finding Number Ten*

■ MHR next argues that the Commissioner's amended finding number ten is unsupported by substantial evidence.

The ALJ found:

---

**3.** Neumann's testimony on cross-examination was:

> Q. Do you deny telling him that a change in his licensing would not affect his funding in any fashion?
> A. No.
> Q. You don't deny that.
> A. No.

> Q. Do you admit telling him that?
> A. No.
> Q. You have no recollection of it one way or the other.
> A. Not really.

Transcript of Record at 14, Department of Human Services v. Muriel Humphrey Residences. (No. HS–88–026–PE; 4–1800–1865–2).

If it is determined that MHR must reimburse the Department of Human Services the amount alleged to be owing, that reimbursement would have to be taken out of the current and future operating funds of MHR. This payback would affect the quality of care MHR would be able to provide.

The Commissioner rejected this finding in its entirety. Instead, she found that "[i]n order to maintain its licensure, the [MHR] facilities must comply with state and federal standards of quality of care."

MHR concedes the general truth of this statement, but questions its relevance. MHR points out that quality standards are merely minimum standards of care with which MHR must comply. It argues that quality care will be jeopardized even though these minimum standards are met. MHR's argument is persuasive. However, DHS might argue that an agency need not explain a rejection of an ALJ's finding of fact since the agency is not bound by them. *See City of Moorhead v. Minnesota Public Utilities Commission,* 343 N.W.2d 843, 847 (Minn.1984).

In *Moorhead,* the MPUC rejected an ALJ's finding where the facts were largely undisputed and the parties drew different inferences from these facts. Moreover, the inferences were based upon other substantial evidence in the record. Here, the Commissioner rejected a fact finding outright. She did not merely draw different inferences from undisputed facts. Furthermore, the *Moorhead* court suggested that the better practice is for the agency to explain its rejection of factual findings. *Id.* at 847.

The effect of the Commissioner's rejection of finding number ten is to undermine MHR's claim of harm resulting from compelled reimbursement of the overpayments. DHS should not reject a factual finding without explanation when the Commissioner is neither reaching a different conclusion based on facts in the record, nor drawing different inferences from undisputed facts. If we allow an agency to reject a factual finding in this manner, we would effectively insulate it from meaningful judicial review. We do not allow the agency to avoid judicial review here, and find that the Commissioner's amended finding number ten is not supported by substantial evidence. We conclude that the ALJ correctly found that requiring reimbursement would adversely affect the quality of care provided by MHR.

## II.

### *Equitable Estoppel*

 Decisions of administrative agencies enjoy a presumption of correctness "and will be reversed only when they reflect an error of law or when the findings are arbitrary and capricious or are unsupported by substantial evidence." *Crookston Cattle Co. v. Minnesota Department of Natural Resources,* 300 N.W.2d 769, 777 (Minn.1980). When this court reviews an agency's ruling on a legal question, we are not bound by the agency's ruling. *See Ekstedt v. Village of New Hope,* 292 Minn. 152, 164, 193 N.W.2d 821, 829 (1972); *see also In re Peoples Natural Gas Co.,* 413 N.W.2d 607, 615 (Minn.Ct.App.1987). The application of equitable estoppel is a question of law. *City of Eden Prairie v. Liepke,* 403 N.W.2d 252, 254 (Minn.Ct.App. 1987). Therefore, the Commissioner's ruling on the application of equitable estoppel to the facts of this case is subject to this court's independent review.

In *Brown v. Minnesota Department of Public Welfare,* 368 N.W.2d 906, 910 (Minn.1985), the supreme court described estoppel as:

> [A]n equitable doctrine addressed to the discretion of the court and * * * intended to prevent a party from taking unconscionable advantage of his own wrong by asserting his strict legal rights. To establish a claim of estoppel, plaintiff must prove that defendant made representations or inducements, upon which plaintiff reasonably relied, and that plaintiff will be harmed if the claim of estoppel is not allowed.

(citing *Northern Petrochemical Co. v. United States Fire Insurance Co.,* 277 N.W.2d 408, 410 (Minn.1979)). When deciding whether estoppel will be applied

against the government, the court must weigh the public interest frustrated by the estoppel against the equities of the case. *Mesaba Aviation Division v. County of Itasca,* 258 N.W.2d 877, 880 (Minn.1977). While the government may be estopped as justice requires, estoppel is not freely applied against the government. *Brown,* 368 N.W.2d at 910.

Two reasons are generally given to justify the more restrictive application of estoppel against government. The first is that courts should not permit unauthorized raids on the public treasury. The second is that courts would undermine the separation of powers principle by refusing to enforce legislation due to misrepresentations by agency officials. *See* Comment, *Unauthorized Conduct of Government Agents: A Restrictive Rule of Equitable Estoppel Against the Government,* 53 U.Chi.L.Rev. 1026, 1033–38 (1986).

While a plaintiff seeking to estop a government agency has a heavy burden of proof, *Ridgewood Development Co. v. State,* 294 N.W.2d 288, 292 (Minn.1980), one type of estoppel claim does not require such a restrictive application of estoppel. When the claimant invokes estoppel to gain access to government benefits which the claimant *could* have obtained had a government official provided correct information, the rationales that justify a restrictive application of estoppel are inapplicable. *See* Comment, *supra,* at 1041. In such a case, the court is neither allowing an unauthorized invasion of the public treasury nor refusing to enforce properly passed legislation. MHR has this type of claim.

### A. *Representation or Inducement*

MHR argues that Neumann made a representation to MHR. The representation was Neumann's statement, after discussing MHR's contemplated licensing change, that the change would not affect MHR's funding although the rules indicated that single facilities of 24 beds or less must maintain 100% occupancy to be eligible for medicare reimbursements for reserved-bed days. DHS does not dispute the fact that some representation was made by Neumann to MHR. Since we accept the ALJ's factual finding that Neumann made a specific representation that MHR's funding would not be affected by the licensing change, MHR has satisfied the first element of its estoppel claim.

### B. *Reasonable Reliance*

MHR claims it reasonably relied on Neumann's representation. Kowalczyk testified that he relied on Neumann for information related to funding, and that Neumann never qualified his answers or referred him to anyone else.

DHS argues that MHR has not demonstrated its reliance was reasonable since a party claiming estoppel must show that it "did not know nor should it have known that its adversary's conduct was misleading." Brief for Respondent at 15, (citing *Heckler v. Community Health Services,* 467 U.S. 51, 59 n. 10, 104 S.Ct. 2218, 2223 n. 10, 81 L.Ed.2d 42 (1984)). Here, Kowalczyk knew generally of the 24–bed or less rule. DHS had sent MHR bulletins specifying reserved-bed day policies and procedures. Kowalczyk knew of these bulletins. Similarly, the Supreme Court has stated:

> [T]hose who deal with the Government are expected to know the law and may not rely on the conduct of government agents contrary to law.
>
> As a participant in the Medicare program, respondent had a duty to familiarize itself with the legal requirements for cost reimbursement.

*Heckler,* 467 U.S. at 63–64, 104 S.Ct. at 2225–26.

Respondent's point is not without merit; however, its reliance on *Heckler* is misplaced. *Heckler* is distinguishable from this case in several respects. First, the medicare provider in *Heckler* was attempting to be paid twice for the same services. Second, in *Heckler,* the provider relied on representations made by a fiscal intermediary rather than the actual government agency. Third, the pertinent government regulations in *Heckler* put the provider on notice that it should seek answers to doubtful questions from the agency itself, not the intermediary. These factors combined

to make the medical provider's reliance on a fiscal intermediary for the resolution of doubtful policy questions unreasonable in *Heckler. Id.* at 64–66, 104 S.Ct. at 2225–27.

Here, MHR's general knowledge of the 24–bed or less rule is not dispositive. The question MHR put to Neuman precisely addressed the application of that rule. The question was whether MHR's licensing change would affect its funding in any way. Neumann responded that it would have no effect. Where MHR could legally be considered two different things—one 36–bed facility or three 12–bed facilities—without changing any of its internal operations, MHR's reliance on Neumann's representation was reasonable.

Furthermore, MHR, unlike the medical provider in *Heckler,* consulted directly with the government agency, DHS. In fact, MHR consulted the same person upon whom it had relied for advice in funding matters before, Mr. Neumann. Since Neumann had given MHR advice on funding matters in prior instances, its reliance on his advice in this situation was reasonable.

Also, under the circumstances, it was reasonable for MHR to expect that DHS would not resort to a technicality, such as the 24–bed or less rule, to cut MHR's funding. The expectation was reasonable because MHR changed its licensing status *on the suggestion of a DHS agent.* MHR could not foresee that DHS would suggest a change in licensing, then apply a different rule to MHR, and then cut MHR's funding. Additionally, MHR's overall occupancy rate remained above the 93% level throughout the period at issue. The 93% rate was what MHR had to meet to be paid for reserved-bed days before the licensing change. It was not unreasonable, based on these facts, for MHR to expect to continue to be paid on that same basis after the licensing change made at DHS's request.

Finally, MHR, unlike the medical provider in *Heckler,* is not trying to obtain a double benefit. MHR is merely trying to keep its funding at the same level it was properly at before it made the requested licensing change. MHR's reliance on the representation of Neumann was reasonable, and the facts here distinguish this situation from the one presented in *Heckler.*

## C. *Harm to MHR*

Once reasonable reliance on a representation has been demonstrated, a court must "balance the equities." Thus, MHR must demonstrate that it will be harmed if its claim of estoppel is to be allowed. *See Brown,* 368 N.W.2d at 910.

In *Brown,* the supreme court rejected this court's finding that Brown would be harmed if the government were allowed to collect its overpayments since Brown would not be able to recover these funds from his medical assistance patients. *Id.* at 911. Although the supreme court did not squarely address the degree of harm a plaintiff must demonstrate, it did emphasize that payments of medical assistance for weight reduction plan services *were not guaranteed,* even if Brown had sought prior authorization. Therefore, one reason the *Brown* court found no harm was because Brown was not forced to disgorge a benefit to which he was otherwise entitled.

*Heckler* more directly focuses on this issue. There, the court held that a provider was not harmed since its only "detriment [was] the inability to retain money that it should never have received in the first place." *Heckler,* 467 U.S. at 61, 104 S.Ct. at 2225. Furthermore, the Court recognized that a finding of detriment could not be based on the provider having to curtail operations while the government collected funds, since expansion of the operation was accomplished through wrongful access to such funds. *Id.* at 62–63, 104 S.Ct. at 2225–26.

Here, MHR argues that if its estoppel claim is denied it will be compelled to deduct the money it owes DHS from current and future operating costs, thereby lowering the quality of care it provides. This was also the finding of the ALJ, uncontradicted, yet rejected by the Commissioner. We find the Commissioner erred in rejecting this finding and hold that the ALJ's finding is evidence of real harm. MHR

also argues that elimination of the respite care beds would be a loss to the community it serves, namely the mentally retarded, their relatives and friends. We agree.

DHS argues that, as in *Heckler*, MHR will only be forced to pay back funds it should not have received. This argument of DHS is incorrect and based on a misconception of *Heckler*. Unlike *Heckler*, MHR *would* have been entitled to reimbursements as a 36-bed facility had it not changed its licensing in reliance on Neumann's incorrect advice. MHR has demonstrated that it will be harmed if it is forced to repay the funds, and the loss would be uncorrectable.

DHS states that MHR is not harmed since the money it would forfeit would only be money used to keep an empty bed, implying MHR received something for nothing. However, the Commissioner's statement of facts states "payment of reserved bed days is for the benefit of residents." Since MHR operates for the benefit of its residents, loss of this reserved-bed funding will directly harm MHR.

### D. *Public Interest vs. Equities of the Case*

In *Brown*, the supreme court refused to grant estoppel because, on the facts of that case, the court concluded that the public interest would be harmed if the government were estopped. *Brown*, 368 N.W.2d at 912–13. The *Brown* court did not establish a blanket "no-estoppel" rule whenever a claim is erroneously paid; rather, it noted that great public harm arises when the government cannot recover funds merely because a handful of claims have been erroneously paid.

A similar public interest is not at stake here. MHR bases its claim of estoppel on a specific representation made by a DHS official. In *Brown*, a portion of the doctor's claim was that the government should be estopped because it processed and paid over 900 claims before it discovered the error. *Id.* at 911. MHR's action is not based on the sole fact that its claims have been paid; MHR correctly states that it would have been substantively entitled to

these payments had it not relied on the incorrect representations of DHS officials. Therefore, the harm to the public present in *Brown* is absent in this case. On the other hand, the harm which will result if MHR's claim is not allowed is established. Thus, the balance of the equities tips in favor of MHR in this case.

DHS argues that "men must turn square corners when they deal with the Government." Respondent's Brief at 19 (citing *Heckler*, 467 U.S. at 63, 104 S.Ct. at 2225 (citation omitted)). The more persuasive citation is as follows:

> It is no less good morals and good law that the Government should turn square corners in dealing with the people than that the people should turn square corners in dealing with their government.

*St. Regis Paper Co. v. United States*, 368 U.S. 208, 229, 82 S.Ct. 289, 301, 7 L.Ed.2d 240 (1961) (Black, J. dissenting).

We hold that the Commissioner's findings were not supported by substantial evidence and that the Commissioner erred by refusing to estop DHS from recovering the amounts in dispute. Thus, we need not address the issue of whether the Commissioner's decision was arbitrary and capricious.

### DECISION

The Commissioner's amended findings numbers three and ten are not supported by substantial evidence in view of the entire record and are rejected in favor of the ALJ's findings. The Commissioner erred by refusing to recognize MHR's claim of estoppel. DHS is estopped from recovering reserved-bed day payments it made to MHR between 1983 and 1986.

REVERSED.