In the Matter of the TEMPORARY IMMEDIATE SUSPENSION OF the FAMILY CHILD CARE LICENSE OF Christine STRECKER.

No. A09–371.

Court of Appeals of Minnesota.

Jan. 12, 2010.

**42**

Pat J. Skoglund, Jessica E. Schwie, Jardine, Logan & O'Brien, P.L.L.P., Lake Elmo, MN, for relator Christine Strecker.

Susan Gaertner, Ramsey County Attorney, David F. MacMillan, Assistant County Attorney, St. Paul, MN, for respondents Minnesota Department of Human Services and Ramsey County Community Human Services Department.

Considered and decided by HALBROOKS, Presiding Judge; KLAPHAKE, Judge; and MINGE, Judge.

## OPINION

KLAPHAKE, Judge.

Relator Christine Strecker appeals from a determination by respondent Minnesota Department of Human Services (DHS) that reasonable cause existed to believe that she posed an imminent risk of harm to the health or safety of the children in her daycare. Relator argues that the DHS finding failed to satisfy the "reasonable cause" standard required by Minn. Stat. § 245A.07, subd. 2a(a), and that the final decision of the Commissioner of Human Services (commissioner) continuing the temporary suspension of her daycare license was not supported by substantial evidence and was arbitrary and capricious. Because we conclude that DHS did not satisfy the burden articulated in the statute, and because we further conclude that the commissioner's final decision was not supported by substantial evidence and was arbitrary and capricious, we reverse.

## FACTS

Relator began operating a daycare in her home in 2002. J.H., a six-month-old infant, began daycare with relator in July 2008. During the week of September 8, 2008, J.H. attended relator's daycare every day, but on Friday, September 12, his mother picked him up in the early afternoon for a well-child checkup. At the checkup, pediatrician Dr. Sandra Mayrand administered three immunizations and performed a routine physical exam. Dr. Mayrand expressed no concerns regarding J.H.'s health at that time. J.H. remained in the care of his mother and father during the weekend and returned to relator's daycare the following Monday.

On Tuesday, September 16, J.H.'s father dropped him off at relator's home. When J.H. first arrived, relator noticed no problems—J.H. appeared in good health. J.H. took an afternoon nap around 1:00 p.m., and when he awoke, relator brought him downstairs. After changing his diaper, relator set J.H. on the carpeted floor to let the other children outside. When she returned, relator saw J.H. exhibiting signs of a seizure. She immediately called 911 and J.H.'s father. J.H. was taken to the emergency room at St. John's Hospital. A CT scan revealed a subdural hematoma, and J.H. was transferred to Children's Hospital. At Children's Hospital, another exam indicated that J.H. had lesions on his left tonsil that were indicative of trauma.

The following day, J.H. had an MRI scan that confirmed the existence of a subdural hematoma. The treating physician, Dr. Mark Hudson, noted in J.H.'s medical records that abusive head trauma was the primary consideration. That same day, relator was interviewed by Roseville police and Jenny Neujahr, a Ramsey County senior child-protection worker. Relator denied harming J.H.

Neujahr also interviewed J.H.'s parents on September 17. Both parents denied that they accidentally bumped or dropped J.H. during the prior weekend. J.H.'s father told Neujahr that he "did not want to point fingers" at relator. Later, Neujahr interviewed relator's two children, who told her that relator does not use physical means to discipline them or her daycare children.

On September 19, J.H. was examined by ophthalmologist Dr. Susan Schloff, who discovered retinal hemorrhages in both of J.H.'s eyes. Dr. Hudson's report, which includes the results of Dr. Schloff's consultation, states that "[w]hen this injury occurred remains somewhat unclear." His report notes that retinal hemorrhages cannot be dated accurately and further notes that the acute nature of J.H.'s subdural hematoma suggested that it could have occurred on September 16 or in the days before.

On September 23, relator agreed to take polygraph tests, but she later declined on the advice of her attorney. J.H.'s parents took a polygraph test, and while parts of the record suggest that both parents passed the polygraph tests, other evidence suggests that the tests may have been inconclusive. The tests revealed that J.H.'s mother had some issues in her childhood as well as an instance of driving while intoxicated, and that J.H.'s father suffered from anxiety and depression.

DHS became involved on September 29, when it received a copy of J.H.'s records from Children's Hospital. DHS contacted respondent Ramsey County Community Human Services (the county) and spoke with Muriel Leko, relator's licensing supervisor. Leko became relator's licensing supervisor when relator first obtained a license to operate a daycare and, over her six years of supervision, Leko conducted three scheduled interviews in relator's home and one or two unannounced drop-in visits. According to Leko, relator was intelligent, always pleasant and cooperative, and Leko received no complaints about her daycare.

By the time DHS contacted Leko on September 29, she had spoken with Neujahr about relator's case but had not learned about the parents' polygraph tests. It was Leko's personal opinion that relator's license should not be temporarily suspended at that point. Leko spoke with Ramsey County Attorney David MacMillan, who also did not support a temporary license suspension due to the difficulty of pinpointing the date and source of J.H.'s head injuries. But DHS directed Leko to recommend a temporary license suspension, and MacMillan told her that she must follow DHS's directive. Leko then wrote a letter to DHS recommending immediate license suspension, but she noted MacMillan's lack of support. DHS issued a temporary suspension of relator's daycare license on the same day.

Relator requested an expedited hearing before an administrative law judge (ALJ) to challenge the temporary license suspension pursuant to Minn.Stat. § 245A.07, subd. 2a(a). In support of continuing relator's temporary license suspension, DHS called Leko to testify at the hearing and introduced six exhibits. The exhibits included the notes of Neujahr detailing her investigation; medical records document-

ing J.H.'s subdural hematoma, retinal hemorrhages, and tonsillar lesions; the medical opinion of Dr. Hudson that retinal hemorrhages cannot be dated accurately; the medical opinion of Dr. Hudson that J.H.'s subdural hematoma could have occurred on September 16 or in the preceding days and that his injuries were consistent with shaken-baby syndrome.

Relator hired Dr. William Ford, a neuroradiologist, to independently examine J.H.'s medical records. Dr. Ford specifically testified that, based on the blood deterioration found in MRI scans, J.H.'s injury occurred "three to five days" before the September 17 MRI. Dr. Ford noted that medical literature suggests a range of three to seven days for blood deterioration. Dr. Ford's medical partner, Dr. Mark Meyers, also reviewed the scans and concluded that J.H.'s injury was present for "at least five days."

Relator also hired a second expert, Dr. Robert Ramsay, to independently review J.H.'s ophthalmological report, and relator introduced his report into evidence. Dr. Ramsay, like Dr. Hudson, noted that retinal hemorrhages cannot be dated accurately, but he further concluded that J.H.'s hemorrhages may have been present for five to seven days before his September 19 eye exam.

Relator also testified and specifically denied shaking, dropping, hitting, or harming J.H. in any way, and several of relator's daycare parents offered evidence consistent with her testimony. Officer Mark Koenig of the Minneapolis Police Department testified that relator was the daycare provider for his children until her license was suspended in September. He stated that relator has an even temper and that his children never said anything negative about her. The ALJ also received five letters from relator's past and present daycare parents, all stating that relator provided a safe and loving environment for their children, that she did not use physical discipline, and that she was trustworthy and attentive. Two families, including Officer Koenig's, volunteered that they would return their children to relator's care if her license were reinstated.

The ALJ recommended rescinding relator's temporary license suspension. In a supporting memorandum, the ALJ concluded that "[a]lthough the medical evidence does not completely rule out [relator] as the injuring person, it does make clear that other individuals may have caused the injury. Under these circumstances, it is not reasonable, without more, to point the finger at [relator]." Therefore, the ALJ concluded that DHS had not shown reasonable cause to believe that relator posed an imminent risk of harm to the health or safety of the children in her daycare.

On February 11, 2009, the commissioner issued a final order adopting the ALJ's findings of fact and conclusions of law, with one exception. The commissioner found that DHS satisfied its burden of demonstrating "reasonable cause to believe that there is a risk of imminent harm to the health and safety of children served by [relator]." In an attached memorandum, the commissioner concluded that the "evidence presents reasonable cause to believe that J.H. sustained [his injury] . . . on or before September 16, 2008," and that "the record is clear that as near as can be medically determined, J.H. could have been injured on a day and at a time when he may have been in [relator's] care." The commissioner's decision rejected relator's medical evidence, reasoning that it did not make the evidence that the injury occurred while J.H. was in relator's care "inherently incredible." Likewise, the commissioner noted that a long history of care and the support of parents also did not make the

possibility that relator caused J.H.'s injury "inherently incredible." On this basis, the commissioner ordered the continuation of relator's temporary license suspension. This certiorari appeal followed.

## ISSUE

Were relator's substantial rights prejudiced by the commissioner's decision to continue her daycare license suspension because the commissioner did not properly apply the "reasonable cause to believe" standard in concluding that relator posed an imminent risk of harm to the health or safety of her daycare children?

## ANALYSIS

The temporary suspension of relator's daycare license is governed by Minn.Stat. § 245A.07 (2008). After the commissioner has temporarily suspended a daycare license, the license holder has the right to a hearing in front of an ALJ. *Id.*, subd. 2a(a). The hearing is to determine "whether the temporary immediate suspension should remain in effect pending the commissioner's final order." *Id.* At this hearing, the burden is on the commissioner to "demonstrate that reasonable cause exists to believe that the license holder's actions or failure to comply with applicable law or rule poses ... an imminent risk of harm to the health, safety, or rights of persons served by the program." *Id.*

### Arbitrary and Capricious

▮▮▮ This court will affirm an administrative decision unless it is "arbitrary and capricious." *HealthPartners, Inc. v. Bernstein*, 655 N.W.2d 357, 360 (Minn.App. 2003), *review denied* (Minn. Mar. 26, 2003); *see* Minn.Stat. § 14.69(f) (2008). "An agency acts arbitrarily if it fails to articulate a rational connection between facts found and the decision made." *In re Claim for Benefits by Meuleners*, 725 N.W.2d 121, 123 (Minn.App.2006); *see In re Blue Cross & Blue Shield*, 624 N.W.2d 264, 277 (Minn.2001) (requiring agency to avoid making arbitrary and capricious decision by articulating "rational connection between the facts found and the choice made"). We decline to give judicial deference to an administrative decision interpreting statutory language when the interpretation "contravene[s] plain statutory language, or where there are compelling indications that the agency's interpretation is wrong." *Meuleners*, 725 N.W.2d at 124 (quotation omitted). "Rejection of [an] ALJ's recommendations without explanation ... may suggest that the agency exercised its will rather than its judgment and was therefore arbitrary and capricious." *In re Blue Cross & Blue Shield*, 624 N.W.2d at 279.

### Reasonable Cause to Believe

Minn.Stat. § 245A.07, subd. 2a, does not include a definition of "reasonable cause to believe that a licensee poses an imminent risk of harm," nor have we found other civil licensing statutes that define this standard.[1] However, *Wall v. Fairview*

---

1. We note that Minn.Stat. § 245C.02, subd. 15 (2008) defines "reasonable cause" in the context of the Department of Human Services Background Studies Act, and is based on a *suspicion* that further evidence *may* exist and gives an example of a report describing a history that *may* pose a risk. Nowhere does that statute reference "reasonable cause to believe" that an imminent risk of harm exists. As the legislature has used different formulations of reasonable cause in various statutes, we presume the legislature intended to reflect a difference in the meaning of the different formulations. *See In re Hildebrandt*, 701 N.W.2d 293, 299 (Minn.App.2005) (stating that courts assume "the legislature's choice of words indicate[s] its intent"). Accordingly, Minn.Stat. § 245C.02, subd. 15, is not instructive here.

*Hosp. & Healthcare Servs.,* 584 N.W.2d 395 (Minn.1998), is instructive. In *Wall,* the supreme court interpreted statutory language pertaining to the reporting requirement of licensed health care professionals that mandated a health care professional to report possible neglect or abuse of a vulnerable adult if the licensee had "reasonable cause to believe" that a vulnerable adult had been neglected or abused. *Id.* at 406. The court found the "reasonable cause to believe" language of that statute analogous to the criminal law standard of probable cause, and interpreted the language as requiring "grounds for belief beyond mere suspicion or foreseeability" and "strong circumstances" supporting the belief held. *Id.*

Further, in the criminal law context, Minnesota courts have long held that "reasonable cause" is synonymous with the criminal standard of "probable cause" based on a reasonable *belief* that constitutes more than a mere bare suspicion. *See, e.g., State v. Childs,* 269 N.W.2d 25, 27 (Minn.1978) (defining probable cause as "circumstances sufficiently strong in themselves to warrant a cautious man in believing the accused to be guilty"); *State v. Harris,* 265 Minn. 260, 263–64, 121 N.W.2d 327, 331 (1963) ("The constitutional mandate requiring 'probable cause' and the statutory standard of 'reasonable cause' are synonymous."); *State v. Olson,* 342 N.W.2d 638, 640 (Minn.App.1984) ("probable cause and reasonable cause are synonymous"); *see also Black's Law Dictionary,* 1321, 1380 (9th ed.2009) (defining "reasonable cause" synonymously with "probable cause" and defining "probable cause," in part, as "more than a bare suspicion").

■ For these reasons, we conclude that the phrase "reasonable cause exists to believe" found in Minn.Stat. § 245A.07, subd. 2a, requires the existence of circumstances sufficient to warrant a cautious person to reasonably believe that relator posed an imminent risk of harm to the health or safety of her daycare children. Here, the commissioner instead applied a different standard, that the evidence was not "inherently incredible," a standard not set forth in the statute. Because the commissioner did not apply the reasonable cause to believe standard, its decision had no basis in law and was therefore arbitrary and capricious.

*Substantial Evidence*

■ We also consider whether the record otherwise contains substantial evidence to support a reasonable belief that relator poses an imminent risk of harm to the health or safety of her daycare children. *See* Minn.Stat. § 14.69(e) (2008). Substantial evidence has been held to mean "(1) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; (2) more than a scintilla of evidence; (3) more than some evidence; (4) more than any evidence; or (5) the evidence considered in its entirety." *Minn. Ctr. for Envtl. Advocacy v. Minn. Pollution Control Agency,* 644 N.W.2d 457, 466 (Minn.2002). We must take contradictory evidence into account when determining whether the agency's decision is supported by substantial evidence. *Dep't of Human Servs. v. Muriel Humphrey Residences,* 436 N.W.2d 110, 114 (Minn.App. 1989), *review denied* (Minn. Apr. 26, 1989). "A review of the entire record is required because evidence which might be conclusive if unexplained, may lose all probative force when supplemented or explained by other testimony." *Id.*

The evidence offered in support of DHS's position consists of the following: (1) J.H. exhibited signs of injury while in relator's care on September 16; and (2) the immediate treating physician concluded that the injury could have occurred on

the 16th or sometime prior to that date. This evidence does not comport with the substantial evidence test because it did not have the probative force required by law or reasonably account for the possibility that the parents were the possible source of injury. *Cf. In re Application of Orr,* 396 N.W.2d 657, 661 (Minn.App.1986) (finding a lack of substantial evidence when basis of agency's decision to deny request for a breakwater project rested on commissioner's speculations regarding future harmful effects of other projects); *State v. Albino,* 384 N.W.2d 525, 528 (Minn.App.1986) (holding that mere presence in a vehicle containing narcotics was insufficient to demonstrate probable cause to support an arrest because the record did not contain strong circumstances pointing to the defendant's guilt).

Furthermore, considering the record in its entirety, the evidence submitted by relator specifically refuted the evidence submitted by DHS. The medical evidence submitted by relator suggested that it was equally likely that J.H. was injured while in the custody of his parents. Relator offered letters of five daycare families, all complimenting her temperament and the safe environment of her daycare. Even J.H.'s parents did not want to blame relator for their son's injuries, and relator's licensing supervisor did not support a temporary suspension of her license. This evidence is certainly relevant to the inquiry of whether relator posed an imminent risk of harm to the health or safety of her daycare children. *See Orr,* 396 N.W.2d at

662 (reversing an agency decision, in part, because of evidence contradicting conclusions of commissioner). Thus, we conclude that the overall record does not include substantial evidence, as required by Minn. Stat. § 14.69(e).[2]

■ We come to this conclusion because the standard which the commissioner was required to apply is belief based on reason. The commissioner's finding that J.H. *"could* have been injured on a day and at a time when he *may have been* in [relator's] care" (emphasis added) is simply not sufficient for a reasonable belief that an imminent risk exists. The references by the commissioner of "could" and "may" describe possibilities, not a belief based on reasonable cause and, as such, are speculative at best. A reasonably cautious person would not believe that relator's daycare facility poses an imminent risk simply because J.H. was present at relator's daycare facility on a day when he may or may not have been injured.

For all of these reasons, we reverse the commissioner's decision.

## DECISION

Because respondent DHS failed to demonstrate by substantial evidence, reasonable cause to believe that relator posed an imminent risk of harm to the health or safety of the children in her daycare, the commissioner's decision to continue the

---

2. The commissioner rejected much of relator's evidence because it did not make its original conclusion "inherently incredible." This standard is not found in Minn.Stat. § 245A.07. It apparently was grafted upon these proceedings by the commissioner from the criminal law which allows the testing of probable cause in a *"Florence"* hearing. Contrary to the criminal law testing of probable cause, the commissioner here can and must weigh conflicting evidence in arriving at the reasonable cause to believe formulation. *See Whitehead v. Moonlight Nursing Care, Inc.,* 529 N.W.2d 350, 352 (Minn.App.1995) (when parties have presented conflicting evidence on the record, the commissioner has the ability to weigh the evidence). Accordingly, the criminal law standard is inapplicable here.

suspension of relator's temporary license was arbitrary and capricious.

**Reversed.**