**In the Matter of the APPLICATION OF
John ALLERS and Konrad Stroh
for Retirement Benefits.**

Nos. C7–95–64, CX–95–172.

Court of Appeals of Minnesota.

June 27, 1995.

Review Denied Aug. 30, 1995.

Bruce P. Grostephan, Peterson, Engberg & Peterson, Minneapolis, for relators John Allers and Konrad Stroh.

Hubert H. Humphrey, III, Atty. Gen., Jon K. Murphy, Lucinda Jesson, Asst. Attys. Gen., St. Paul, for respondent Public Employees Retirement Association.

Considered and decided by
SCHUMACHER, P.J., TOUSSAINT, C.J., and HOLTAN,* J.

## OPINION

HARVEY A. HOLTAN, Judge.

Relators John Allers and Konrad Stroh challenge the Public Employees Retirement Association's (PERA) determination of their pensions. In particular, Allers claims PERA erred in (1) denying him early retirement incentives, (2) failing to include "income reserve days" as "salary," and (3) altering his salary for the purpose of calculating his pension. Stroh joins Allers in contending that PERA exceeded its authority in refusing to include "income reserve days" and in refusing to include certain raises Stroh received for purposes of his pension calculation. We disagree and affirm.

## FACTS

### A. Leave of Absence

The Richfield School District hired relator John H. Allers as a custodian in 1960. Allers submitted a letter of resignation dated January 15, 1969, advising the school district that he was accepting a position as a business agent for Building Service Employees Union Local 284 (Local 284). The school board took no action on his letter of resignation. Five days later, Allers prepared a new letter, requesting a leave of absence effective February 1, 1969, rather than a resignation. Although the school superintendent accepted Allers's request for a leave of absence, the school board never acted upon Allers's petition. In 1970, Allers applied for and received a refund of his contributions to PERA while

he was employed at the Richfield School District.

In 1972, the school district superintendent notified Allers that his leave would be terminated in September of 1972. Allers replied that a recent statute enacted by the Minnesota Legislature required the school district to maintain Allers's leave of absence. *See* Minn.Stat. § 179.19 (1969) ("Any employee who is elected to a full time position in a labor organization shall be given a leave of absence for the duration of time holding such office.").[1] The superintendent, after consulting with counsel, agreed to maintain Allers's leave of absence because of this alleged law.

In 1975, the legislature passed a law allowing former members of PERA currently employed by unions that represented public employees to join PERA based upon their union membership. Pursuant to this law, Allers applied for PERA membership, noting that he was an employee of the Richfield Public Schools from August 1960 to January 1969. In order to link his 1975 PERA membership with his prior PERA membership, Allers and Local 284 paid employee and employer contributions plus interest for the five years he worked exclusively for Local 284. Allers also reimbursed PERA for his 1970 refund.

### B. Local 284's Factor System for Setting Employee Salaries

In 1979, Local 284's salary negotiating committee determined that the union's method of annually negotiating each business agent's salary was too cumbersome. At the general membership meeting, the committee presented a new method of computing the salaries of Local 284's employees: the factor system. Under this system, borrowed from the Bloomington School District, each business agent, including Allers, received an annual salary increase equal to 1.6541 times the average annual salary increase of the five highest paid union members. Therefore, because the five highest paid union members received a raise of $90.80 per month in 1979,

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

1. Minn.Stat. § 179.19 does not apply to "the state or any political or governmental subdivision thereof." Minn.Stat. § 179.18, subd. 3 (1971).

Local 284's business agents received a raise equal to 1.6541 times $90.80, or $150.19 per month. Under this same system, Allers, as Local 284's president, received a raise equal to 2.2 times that received by the average of the five highest paid union members. The general membership adopted the factor system.[2]

In 1987, Local 284 adopted Article VII to the local's Constitution and Bylaws. Article VII required the executive board to annually submit the salaries of the union's employees to the general membership for its approval.

From 1990 to 1993, Local 284's employees' salaries were determined by applying a factor of 5, rather than the earlier factor of 1.6541. During that same period, Local 284's executive board did not submit the union employees' annual salaries to the general membership for approval.

### C. *Income Reserve System*

Allers's 1991 employment agreement with Local 284 contained the following clause:

> Sick leave shall be granted by the union to the business manager, John H. Allers, in the amount of one (1) day per month, accumulation unlimited. If the business manager, John H. Allers, voluntarily or involuntarily terminates his service, he shall be compensated in the amount of full pay for his accumulated sick leave up to one hundred fifty (150) days.

Other employees of Local 284 signed similar contracts. Local 284 interpreted the income reserve system to allow retroactive calculation dating to the employee's first day of employment, and to allow employees to cash out income reserve days even prior to termination of employment. Under this interpretation, Allers had already accumulated 269 income reserve days, and earned twelve more

in both 1992 and 1993, for a total of 293 income reserve days. Allers cashed in 65 days in the first six months of 1992, 104 days in the last six months of 1992, 104 days from January through May of 1993, and 15 days through the end of 1993.[3]

In late 1993, the State Auditor's office began an investigation of PERA members whose salaries exceeded 95 percent of the Governor's salary.[4] One of the 18 members investigated was Allers, who reported a salary of $150,118 to PERA for the year ending June 1993. As a result of the investigation, Local 284's general membership meeting of December 15, 1993, included a discussion of employee salaries. Allers reported a 1993 salary of $86,691.14: $21,186.36 as business manager of the union; $61,937.26 as business agent, and $3,567.52 as president. Allers's W–2 forms indicate the following annual salaries:

| | |
|---|---|
| 1988 | $64,078.02 |
| 1989 | $62,947.19 |
| 1990 | $66,628.94 |
| 1991 | $73,202.97 |
| 1992 | $125,329.64 |
| 1993 | $124,861.16.[5] |

The W–2 statements include the income reserve days Allers redeemed in 1992 and 1993, income reserve that the record demonstrates was not submitted to the general membership for approval.

### D. *Early Retirement Incentive*

In 1993, the legislature passed an early retirement incentive (ERI) that allowed public employees to retire at age 55 if they had 25 years of service and retired after May 17, 1993, but before January 31, 1994. In return, early retirees would receive an increase in benefits of approximately 16 percent. A bulletin of the Minnesota Department of Em-

---

2. Of Local 284's 6,500 members, an average of 30 members attended the general membership meetings. Of the members in attendance, eight were officers or employees of Local 284.

3. We note that the record does not disclose the disposition of Allers's remaining nine income reserve days.

4. Most public employees are governed by statutorily mandated salary caps. In most circumstances, their salaries cannot exceed 95 percent

of the governor's salary. *See, e.g.,* Minn.Stat. § 15A.081, subd. 7b (1992) (capping the salary rates for higher education officers at 95 percent of the governor's salary).

5. The record does not disclose the reason or the basis for the three different salaries Allers reported for 1993: (1) $150,118 to PERA; (2) $86,-691.14 to the general membership of Local 284; and (3) $124,861.16 on his W–2 forms.

ployee Relations explained the ERI as an attempt to avoid state employee layoffs.

In late 1993, Allers submitted an undated letter of resignation effective January 7, 1994. Allers wrote to PERA requesting retirement information. PERA replied that Allers was ineligible to receive the ERI because, as an employee of Local 284, he was not employed by a public employer.

Allers next contacted Allen E. Eldridge, PERA's manager of retirement benefits. Eldridge met with Allers and his wife, Judy Allers, in late November 1993. Eldridge advised them that PERA records reflected that Allers terminated his employment with the Richfield School District in 1969. Allers countered that he was only on a leave of absence. Eldridge then noted that on Allers's 1975 application to PERA, Allers applied as a former PERA member.

Allers next contacted Lowell Larson, superintendent of the Richfield School District. Allers submitted a letter which stated:

> As you are aware, I am currently on a leave of absence from the Richfield School District. I am contemplating taking advantage of the early retirement incentive offered by the Public Employees Retirement Association.
>
> I would like to clear the district's files relative to my leave of absence by returning to work with the Richfield School District on January 4, 1994, and submitting my resignation as an employee of the district effective January 5, 1994.

Allers also told Larson that he might be entitled to severance benefits from the school district, including accumulated sick leave or vacation, but that he did not intend to collect those benefits. Based upon an opinion of the Attorney General, the Richfield School District denied Allers's request to return to work.

In a letter dated January 4, 1994, Allers tendered his resignation to the school district. Larson responded that the school board had determined that he was not an employee, and therefore "cannot accept or

otherwise act upon your resignation." On January 6, the PERA Executive Director advised Allers that Allers's request for ERI was denied.

In March of 1994, PERA's executive director informed Allers by letter that the income reserve payments could not be used to determine Allers's salary for pension purposes. The letter also informed Allers that PERA would not use the raises Allers received pursuant to a factor of 5 in his pension computation. PERA therefore determined that Allers's pension would be $2,668 per month. If PERA had used the salary Local 284 reported, including the income reserve, Allers's pension would be $3,923 per month. If Allers were also eligible for the ERI, his pension would be $4,495 per month.

### E. Konrad Stroh

In early 1994, PERA investigated an unusually high salary for Konrad Stroh, Local 284's current president. Local 284 advised PERA that Stroh received $6,480.95 as an income reserve payment in addition to his base salary. PERA informed Local 284 and Stroh that income reserve payments did not qualify as salary for purposes of PERA. Stroh appealed PERA's decision to the Board of Trustees (PERA Board); his appeal was consolidated with that of Allers. Because Stroh also received raises under the factor system, Stroh joins Allers's appeal of the PERA Board's decision to disregard certain salary increases based upon the factor system.[6]

### ISSUES

1. Does the PERA Board have authority to interpret a union's constitution and bylaws in order to determine "salary" for PERA pension purposes?

2. Did the PERA Board err in determining that Allers's and Stroh's income reserve payments did not qualify as "salary" for pension purposes?

3. Did the PERA Board err in determining that Allers was not eligible for ERI?

---

6. This opinion's analysis of those issues in which Stroh joins Allers, while referring only to Allers, also applies to Stroh.

4. Is the transcript provided by appellant properly before this court?

## ANALYSIS

Allers and Stroh filed for a writ of certiorari, seeking this court's review of the PERA Board's determination of their pensions. Because the board "hear[d] the view of opposing sides presented in the form of written and oral testimony, examine[d] the record, and ma[de] findings of facts," we review the board's decision under the substantial evidence standard. *In re Signal Delivery Serv.,* 288 N.W.2d 707, 710 (Minn.1980). The Minnesota Supreme Court has defined substantial evidence as follows:

> "[B]y 'substantial evidence' test is meant: 1) such relevant evidence as a reasonable mind may accept as adequate to support a conclusion; 2) more than a scintilla of evidence; 3) more than 'some evidence'; 4) more than 'any evidence'; and 5) evidence considered in its entirety. There are correlative rules or principles that must be recognized by a reviewing court, such as: 1) unless manifestly unjust, inferences must be accepted even though it may appear that contrary inferences would be better supported; 2) substantial judicial deference to the fact-finding processes of the administrative agency; and 3) the burden is upon appellant to establish that the findings of the agency are not supported by the evidence in the record, considered in its entirety."

*Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 825 (Minn.1977) (quoting trial court and noting its statement of law was correct).

1. As an initial matter, Allers contends that the PERA Board exceeded its authority in rejecting Local 284's use of the 5 factor in calculating Allers's salary from 1989 to 1993. To analyze Allers's argument, we must first ascertain the extent of the PERA Board's authority.

The rules governing PERA are contained in Chapter 353 of the Minnesota Statutes. Minn.Stat. § 353.03, subd. 1 (1992) mandates that "[t]he management of the public employees retirement fund is vested in a board of trustees." Under the explicit terms of the statute, the PERA Board

shall adopt, alter, and enforce reasonable rules consistent with the laws of the state for the administration and management of the fund, for the payment and collection of payments from members, and for the payment of withdrawals and benefits. It shall pass upon and allow or disallow all applications for membership in the fund and shall allow or disallow claims for withdrawals, pensions, or benefits payable from the fund.

*Id.,* subd. 3(b) (1992). The statute further requires the board to "establish procedures to assure that a benefit applicant and recipient may have a review of a benefit eligibility or benefit amount determination affecting the applicant or recipient." *Id.,* subd. 3(c) (1992).

The legislature also has imposed a fiduciary responsibility upon members of the PERA Board. Minn.Stat. §§ 356A.01, subd. 8, 356A.02, subd. 1 (1992). The fiduciary duty requires the PERA Board to

act in good faith and [to] exercise that degree of judgment and care * * * that persons of prudence, discretion, and intelligence would exercise in the management of their own affairs, not for speculation, considering the probable safety of the plan capital as well as the probable investment return to be derived from the assets.

Minn.Stat. § 356A.04, subd. 2 (1992). The PERA Board owes the fiduciary duty to (1) the active, deferred, and retired members of the plan; (2) the taxpayers of the state; and (3) the State of Minnesota. *Id.,* subd. 1 (1992).

■ By definition, PERA is a retirement fund for public employees. Minn.Stat. § 353.017 (1992), however, allows certain private employees to participate in PERA. Pension claims by private employees within the PERA membership present the PERA Board with an atypical situation. Whereas PERA can accord deference to the salary of a member because the member is employed by a public agency, *see* Minn.Stat. § 43A.17, subd. 1 (1992) ("[t]he salary * * * of the head of a state agency in the executive branch is the upper limit of compensation in the agency"), no statutory ceiling on salaries

applies to private employees. Because the legislature endowed the PERA Board with broad powers to "allow or disallow claims for withdrawals, pensions, or benefits payable from the fund," we hold that the fiduciary duty the PERA Board owes its members, the taxpayers of the state, and the state requires PERA to be even more diligent in policing the salary reports of the limited number of private employees within its purview.[7]

Turning to the facts of this case, Allers joined PERA in 1975 as a private employee pursuant to Minn.Stat. § 353.017. The record reflects that the sole constraint on his salary was Article VII of Local 284's Constitution and Bylaws, which provided that the union's executive board had to annually divulge the salaries of the unions' employees in order to acquire the general membership's approval. The record further reflects that between 1989 and 1993, Allers's actual salary was not revealed to the general membership, and when Allers did report his salary to the general membership in 1993, he revealed a salary substantially below that reported to PERA for the same time. Because Allers and Local 284 ignored the sole constraint on Allers's salary, the PERA Board's decision not to utilize Allers's salary increases pursuant to a factor of 5 in calculating Allers's pension was rational, and therefore was a proper exercise of the PERA Board's authority.[8]

Allers first argues that the PERA Board erred because Allers's salary, as computed under the factor of 5, was reasonable. Minn. Stat. § 356.215, subd. 4d (1992) governs the

interest and salary assumptions for purposes of ascertaining pensions. The statute specifically states: "For funds governed by chapters 352, 352B, 353, 353C, and 354, the actuarial valuation must use a * * * future salary increase assumption of 6.5 percent." *Id.,* subd. 4d(a) (1992) Allers claims that if his salary is annually adjusted by 6.5 percent from 1980, his salary in 1993 would exceed his actual 1993 salary (not including the income reserve compensation) by $40.86.

Allers's application of the statutory actuarial valuation is inappropriate. The actuarial valuation is a mandated conservative practice implemented in an effort to guarantee adequate funds to meet future pension fund needs. In other words, the actuarial valuation is purposefully inflated, in an effort to ensure that pension funds are not exhausted. Therefore, the actuarial valuation is not a *standard* for determining a salary's reasonableness, although it may provide *some* evidence of reasonableness.

Allers's argument also neglects the procedural posture of this case. Because Allers seeks review of an administrative agency's ruling, the burden is upon Allers to establish that the findings of the agency either are not supported by the evidence in the record, considered in its entirety, or are arbitrary and capricious. *See Markwardt v. Water Resources Bd.,* 254 N.W.2d 371, 374 (Minn.1977). Evidence that Allers's 1993 salary may have been "reasonable" in relation to his 1980 salary fails to demonstrate that the PERA Board's decision was arbitrary and capricious.[9]

---

7. In his oral argument, Allers's attorney conceded that "the record shows * * * that PERA has ten or less people who are union employees, who are members of PERA under the statute 353.017, so our contention is there's not thousands, our contention is by the testimony of the director of PERA is that there's only ten." App. Rebuttal Arg.

8. This is especially true in light of the fact that public employees compose the general membership of Local 284. As public employees, the general membership of Local 284 are all members of PERA. Therefore, the PERA Board owes a fiduciary duty not only to the state and public employees outside Local 284, but also to the general membership of Local 284 itself to ensure that PERA's funds are not unreasonably depleted.

9. Even if we were to examine the reasonableness of Allers's salary, we find Allers's argument unconvincing. One problem with Allers's calculations is that they begin in 1980. PERA is only contesting his raises since 1989, when the union changed Allers's multiplying factor from 1.6541 to 5. The record indicates Allers's 1989 salary was $62,947.19. Applying an annual increase of 6.5 percent, to use Allers's own figure, results in the following "proper" salaries:

| | |
|------|------------|
| 1989 | $62,947.19 |
| 1990 | $67,038.76 |
| 1991 | $71,396.28 |
| 1992 | $76,037.04 |
| 1993 | $80,979.45 |

Therefore, Allers's actual 1993 salary (not including the income reserve compensation) of $86,-

Allers next argues that because the PERA Board includes representatives of public employers, the PERA Board should be disqualified from determining the validity of a union employee's salary. Allers's argument, however, is irrelevant to the proceedings before this court. The PERA Board has neither reduced nor interfered with the salary Allers received from the union. Allers's salary is only relevant to this proceeding in that the PERA Board determined Allers's reported salary was not a valid benchmark from which to calculate his pension. In other words, the PERA Board's ruling does not require Allers to return any portion of the salary he received; it holds that a portion of his salary will not be used in his pension calculation. Because we hold that the PERA Board's actions have no bearing on Allers's union activities, we do not consider the parties' arguments citing the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 501 (1988), and federal case law interpreting the act.

■ 2. Allers also challenges the PERA Board's decision to ignore his "income reserve payments" for purposes of calculating his pension. The legislation creating PERA defines "salary" as follows:

> "Salary" means the periodical compensation of a public employee, before deductions for deferred compensation, supplemental retirement plans, or other voluntary salary reduction programs. *Unused annual or sick leave payments, in lump-sum or periodic payments, are not salary.*

Minn.Stat. § 353.01, subd. 10(a) (1992) (emphasis added). Allers argues that the income reserve payments do not constitute lump sum sick leave payments, but rather, constitute a bonus for which he has independently contracted with Local 284. The problem with Allers's argument is that his "income reserve" accumulations are dependent upon the existence of accumulated sick leave. Given the direct causal relationship between Allers's accumulation of sick leave and his income reserve payments, the income reserve payments constitute lump sum sick leave

payments for the purposes of Minn.Stat. § 353.01, subd. 10. *See Michigan State Police Command Officers' Ass'n v. Michigan Dep't of Pub. Safety,* 80 Mich.App. 278, 263 N.W.2d 47, 48 (1978) (noting that " 'salary' is paid for service, not sick leave").

Allers also contends that not allowing sick leave payments is violative of equal protection because an employee who uses sick leave can count the income from his "sick" days as salary, but cannot count the "income" if he or she merely cashes in the sick leave without missing work. We disagree.

■ The equal protection clauses of both the federal and state constitutions "requires equality of application of the laws; that all similarly circumstanced be treated alike." *Anderson v. City of St. Paul,* 226 Minn. 186, 194, 32 N.W.2d 538, 543 (1948) (citing *Louisville Gas & Elec. v. Coleman,* 277 U.S. 32, 37, 48 S.Ct. 423, 425, 72 L.Ed. 770 (1927). This court will not sustain an equal protection challenge to a regulation unless the distinction between two similarly situated groups is arbitrary and capricious and has no relation to any legitimate regulatory purpose. *City of St. Paul v. Dalsin,* 245 Minn. 325, 331, 71 N.W.2d 855, 859 (1955).

■ As an initial matter, we do not believe that those who use sick leave are "similarly circumstanced" as those who seek lump sum cash payments for unused sick leave. Implicit in a usual full-time employment agreement is a premise that an employee will receive salary for every working day of the year. The concept of sick leave recognizes that an employee who misses work due to ill-health should not be penalized financially. Days missed due to sickness in a year are compensated through the use of sick leave, thus providing the employee with a steady income unimpaired by health interruptions. In this manner, used sick leave is rationally considered as salary.

This same rationale is not present when illness does not interrupt the employee's work. In such cases, the concern for penalizing an employee is not present. Any sick

691.14 was $5,711.69, or 6.59 percent, in excess of what his salary would have been if Allers had received an annual salary increase of 6.5 per-

cent. In other words, even if Allers's "reasonableness" argument had merit, his 1993 salary was not reasonable.

leave funds drawn when work is not interrupted is in excess of the employee's annual wage, and therefore is not "salary." Instead, the payment for unused sick leave constitutes a rationally distinguishable payment: the "lump sum sick leave payment."

Even if we agreed with Allers that Minn. Stat. § 353.01, subd. 10 treats similarly situated individuals differently, we do not find the equal protection violation of which Allers complains. This court recently reaffirmed that administrative convenience and lower expense are legitimate reasons for distinguishing between two seemingly similar groups. *See Rocco Altobelli, Inc. v. State Dep't of Commerce*, 524 N.W.2d 30, 38 (Minn. App.1994) ("The state's exemption of independent contractors from certain tax payments is justified by the administrative convenience and expense."). We determine that the administrative convenience associated with not having to subtract used sick leave days from a person's salary justifies the distinction Allers condemns. *See Maliszewski v. Regan*, 144 A.D.2d 170, 534 N.Y.S.2d 718 (1988) (determining that "to exclude additional payments received for accrued vacation when a member chooses to work rather than take time off during his final year of employment is rational") (citations omitted). Because we conclude that the distinction Allers raises is rational, we reject Allers's equal protection challenge to Minn.Stat. § 353.01, subd. 10.

3. Allers also claims the PERA Board erred in determining that he is not covered by the statute creating ERI benefits for public employees. We disagree.

In 1993, the Minnesota Legislature passed legislation offering ERIs to eligible employees. 1993 Minn.Laws ch. 192, § 108. The purpose of the legislation was to prevent layoffs in public agencies. *See id.*, subd. 1 ("The incentives must be offered to eligible employees of all state agencies if the commissioner of employee relations and the commissioner of finance certify that layoffs in any of the agencies would occur without the incentives."). The legislation defines eligible employees to include:

> A person *employed by a public employer* offering the incentive is eligible to receive the incentive if the person:
>
> (1) has at least 25 years of combined service credit in any Minnesota public pension plans * * *;
>
> (2) upon retirement is immediately eligible for a retirement annuity from a defined pension plan, if the person is a member of a defined pension plan;
>
> (3) is at least 55 years of age; and
>
> (4) retires on or after May 17, 1993, and before January 31, 1994.

*Id.*, subd. 2 (emphasis added). The legislation also mandates that a person applying for ERI had to terminate active employment in order to be eligible. *Id.*, subd. 5.

Allers initially argues that he was "employed by a public employer" because he was on a leave of absence from his position as a custodian with the Richfield School District, a position from which he did not resign until 1994. Allers asserts that his employment with the school district was a property right, of which he cannot be deprived without a hearing.

■ Allers's property argument, however, is irrelevant to this appeal. The record reflects that the Richfield School District did not consider Allers an employee of the school district. The PERA Board accepted the school district's position. While Allers's property right argument may be relevant in a legal challenge to the Richfield School District's decision,[10] for purposes of his pension, Allers failed to demonstrate that he was "employed by a public employer" at the time of his retirement, and therefore is not entitled to ERI. The evidence Allers did present on the record is conflicting, contradictory, and confusing. For example, Allers indicated on a number of applications that his tenure with the Richfield School District ended in 1969. Similarly, in 1970 Allers sought and received a refund of PERA contributions paid while he was an employee of the school district.

10. We express no opinion on whether Allers has a cognizable legal claim against the Richfield School District.

The PERA Board acted in neither an arbitrary nor capricious manner when it declined to accept Allers's argument that he was on a leave of absence from the school district until 1994.

Moreover, Allers has failed to direct this court's attention to any portion of Chapter 353 that prevents the PERA Board from accepting the Richfield School District's decision as to Allers's employment status. Our own scrutiny of the chapter has failed to reveal any such provision. Here, the school district's and Allers's conclusory evidence as to Allers's employment status with the school district is merely additional evidence that the PERA Board must consider in making its decision. We conclude that the record contains substantial evidence to support the PERA Board's acceptance of the Richfield School District's position on Allers's employment status.

 Even if Allers was in fact "employed by a public employer," we conclude that Allers was outside the scope of the ERI legislation. Subdivision 5 of the ERI legislation requires ERI applicants to leave active employment. Allers claims that because the subdivision does not specifically state "active public employment," his retirement from active *private* employment with Local 284 meets the statutory mandate of subdivision 5. Allers's argument, however, improperly focuses on one part of the legislation without reference to all its parts. *See Owens v. Federated Mut. Implement & Hardware Ins.*, 328 N.W.2d 162, 164 (Minn.1983) ("A statute should ordinarily be construed as a whole to harmonize all its parts."). An examination of the other portions of the statute reveals the legislature's intent to extend ERI's benefits to active public employees. *See* 1993 Minn.Laws ch. 192, § 108, subd. 1 ("The incentives must be offered to eligible employees of all state agencies."); subd. 2 ("A person employed by a public employer offering the incentive is eligible."). Therefore, we construe subdivision 5 to require retirement from active public employment as a prerequisite to receipt of ERI benefits.[11]

Subdivision 1 of the ERI legislation provides that the purpose behind the offer of ERI benefits was to prevent a crisis in public employment that, absent the grant of ERI, might have prompted statewide layoffs of public employees. Phrased alternatively, the state needed senior employees to retire because the state simply did not have enough funds to meet the payroll. Allers's early retirement from Local 284 did not reduce the demand on the public payroll.[12]

 4. The record reflects that relators sought to submit a transcript of a PERA Board meeting as evidence before the Administrative Law Judge (ALJ). The ALJ declined to include the transcript as part of the record. Relators never appealed this evidentiary ruling to the PERA Board. As such, the transcript is not part of the record on appeal and is stricken. *See Deike v. Smelting*, 413 N.W.2d 590, 592 (Minn.App. 1987) (refusing to consider pages of a union contract relator appended to his brief on

---

**11.** Allers also claims that Minn.Stat. § 353.017, the statute under which he rejoined PERA, grants him the rights of all PERA members. Even if Allers's argument is valid, we note that the ERI legislation was passed in 1992, whereas the legislature enacted Minn.Stat. § 353.017 in 1975. Because the ERI legislation came later in time, any discrepancies between the ERI legislation and Minn.Stat. § 353.017 must be resolved in favor of the ERI legislation. *See* Minn.Stat. § 645.26, subd. 4 (1992) (law enacted most recently controls where provisions conflict with laws enacted in prior legislative session).

**12.** Allers argues that if he had elected to end his leave of absence from the Richfield School District, the school district would have been forced to discharge another employee with less seniority than Allers. Therefore, Allers contends, his retirement from the Richfield School District prevented a public layoff. Allers's argument has no merit for two reasons. First, the discharge Allers claims he prevented by retiring had no relation to the layoffs the ERI legislation was intended to prevent in that the discharge would have occurred regardless of the statewide crisis. The mere temporal nexus between Allers's decision not to return to the school district and the ERI legislation does not qualify Allers for ERI. Second, Allers argues in the abstract. He has made no showing that the Richfield School District would in fact have been forced to discharge a less senior employee had Allers been permitted to return. Absent such an affirmative showing, we cannot find that the PERA Board's action was arbitrary and capricious.

appeal when the contract pages were not part of the record).

## DECISION

Because the legislature has accorded the PERA Board broad powers to administer the PERA fund, and has imposed a stringent fiduciary duty on the PERA Board, the PERA Board's exclusion of certain salary claims from Allers's pension calculation was not arbitrary and capricious. Likewise, the legislature has explicitly excluded lump sum sick leave payments from the pension calculations. The PERA Board's exclusion of certain income reserve payments for purposes of calculating Allers's pension was not arbitrary and capricious. The PERA Board acted within its statutory authority when it determined that Allers was ineligible for early retirement benefits extended to active public employees.

Affirmed.