**In the Matter of the Application of Carol HILDEBRANDT for Duty–Related Correctional Plan Disability Benefits.**

**No. A04–2127.**

Court of Appeals of Minnesota.

Aug. 9, 2005.

Joseph T. O'Neill, O'Neill, Grills & O'Neill, P.L.L.P., St. Paul, MN, for relator Carol Hildebrandt.

Mike Hatch, Attorney General, Rory H. Foley, Assistant Attorney General, St. Paul, MN, for respondent PERA.

Considered and decided by WRIGHT, Presiding Judge; TOUSSAINT, Chief Judge; and PETERSON, Judge.

## OPINION

TOUSSAINT, Chief Judge.

Relator Carol Hildebrandt challenges the decision of respondent the Public Employee's Retirement Association (PERA) denying her duty-related disability benefits. She argues the PERA board erred in interpreting the phrase "act of duty" in Minn.Stat. § 353E.06 (2004) to mean that the disability must arise from an inherent danger associated with her job. She also argues that because all four doctors who examined her concluded that her disability was job related, the PERA board's determination is arbitrary and unsupported by the evidence. Because we conclude that under the unambiguous language of Minn. Stat. § 353E.06, subd. 1(2004), Hildebrandt is entitled to duty-related disability benefits, we reverse the board's determination.

## FACTS

Carol Hildebrandt is a 61–year–old woman who worked for the Lake of the Woods Sheriff's Department as a jailor/dispatcher from 1981 to September 2003. On September 8, 2003, Hildebrandt's last day of work, she answered a 911 call from a woman whose son was having a seizure. When the call was disconnected because of a computer malfunction, Hildebrandt was unable to secure the name or address of the caller. Although the sheriff was able to help resolve the situation, Hildebrandt became very nervous and upset. She was dizzy, short of breath, scared, and shaking. At this point she decided she could no longer handle the strain of being a 911 operator and resigned her position.

On September 10, 2003, Hildebrandt was examined by Dr. Amy Fletemier, who diagnosed Hildebrandt as suffering from "depression/anxiety" and chronic pain in her upper and lower back. Dr. Fletemier's report states that these conditions render Hildebrandt "physically or mentally unfit to perform the duties of a correctional officer. This is a direct result of an injury or illness which occurred during, or arose out of, an act of duty."

On September 17, 2003, Hildebrandt submitted an application for duty-related disability benefits under Minn.Stat. § 353E.06 (2004). In the "injury/illness" section of the application, Hildebrandt states that she has been suffering from "extreme pain in my upper back . . . [and] I have had a lot of difficulty with my job mentally especially the 911 operator." She also states in the application:

On Sept. 8th, I again had extreme pain in [my] upper back.... I felt like running out of my office. I had a 911 call that I felt wasn't handled properly because of equipment failure. I came very close to panicking. I was shaking, crying, I felt like I couldn't breathe, I wasn't dizzy, but I felt like I couldn't stand.... I can't remember the last time I laughed. I can't remember a day I haven't broke down and cried. After 22 years as [a] 911 operator/dispatcher/jailer I feel physically and mentally broke down.

After receiving Hildebrandt's application, the PERA staff requested the Minnesota Department of Health review Dr. Fletemier's report. Dr. William Paule of the department of health opined that Hildebrandt "meets the criteria for occupational disability" and concluded that a review of the case in one year would be appropriate "[b]ecause of the possibility of improvement in depression, etc."

In November 2003, the PERA staff requested the department of health to authorize a psychiatric independent medical examination of Hildebrandt. The examination was conducted by Dr. Lori Suvalsky. Dr. Suvalsky diagnosed Hildebrandt as suffering from "panic disorder, depression not otherwise specified." Dr. Suvalsky also concluded that Hildebrandt's disability was "a direct result of an injury or illness which occurred during, or arose out of, an act of duty." In reaching her diagnosis, Dr. Suvalsky found that Hildebrandt

was relatively symptom-free for a number of years until she got into a situation at work where the workload that was expected of her seemed to be above what she was capable of, both in terms of quantity and in terms of skill level.... Ms. Hildebrandt clearly suffers from depressive symptomatology. More prominent, however, is her panic disorder, which is directly related to her self-esteem issues and her inability to function in a high stress environment. She clearly is occupationally disabled ... and could not work in this setting in the future, as her anxiety level escalates dramatically when she is put in that position.

After receiving Dr. Suvalsky's report, the PERA staff again requested the department of health to determine if Hildebrandt was occupationally disabled. After reviewing the report, Dr. Mankey of the department of health concluded Hildebrandt "meets the criteria for occupational disability ... [and] future medical evaluations may be waived."

In March 2004, PERA denied Hildebrant's application for duty-related disability benefits, instead finding that she was entitled to non-duty-related benefits.[1] According to the testimony of PERA Pension Analyst Coordinator Patricia Kappelhoff, PERA denied duty-related benefits because

the back problems that had been experienced by Ms. Hildebrandt had been corrected. That the workstation had been taken care of, and that was no longer a problem. And that the anxiety attacks and panic disorders actually [were] caused by the interpersonal relationships with her employer rather than the job itself. And so, the committee had determined at that point that it was a non-duty-related disability benefit.

Hildebrandt then requested a fact-finding hearing before an Administrative Law Judge (ALJ). The ALJ concluded that

---

**1.** Non-duty disability would entitle Hildebrandt to receive 19% of her highest average salary, while duty-related disability would pay her 47.5% of that salary. *See* Minn.Stat. 353E.06, subds. 1, 2.

Hildebrandt had shown "by a preponderance of the evidence that her disability is the direct result of an injury or sickness that was incurred in or arose out of an act of duty. Her disability is primarily emotional, and secondarily physical. Both of these arose out of her work as a dispatcher/jailer." In the accompanying memorandum, the ALJ concludes:

Hildebrandt's disability is predominately caused by her mental and emotional reaction to problems on the job. Some of these problems were caused by favoritism shown to the new male coworker. Others were caused by his behavior and attitudes. Another cause was the impact of new technologies and new procedures that were imposed without giving Hildebrandt the kind of training and break-in period that she needed. Finally, some part of the job would have been stressful under any circumstances. 911 call from frantic persons, being alone with prisoners accused of all sorts of crimes—these did create moments of stress that would challenge most people. All of these factors, taken together, plus the discomfort from the physical problems, caused Hildebrandt to conclude that she just could not handle the job any longer.

In August 2004, the PERA staff issued a memorandum taking exception with some of the ALJ's findings and his conclusion and stated the staff believed duty-related benefits "are payable only when the disability results from an act of duty which exposes the member to the heightened risks for which these benefits were intended, and not where as here the disability results from personality conflicts with coworkers and complaints about working conditions." In disputing the ALJ's finding that Hildebrandt became upset when a computer malfunction occurred during a 911 call, the staff argued:

While it is true that Ms. Hildebrandt testified about the computer malfunction and her immediate reaction to it, the finding must be read in context with the other findings indicating that Ms. Hildebrandt was experiencing anxiety as a result of personnel changes and office reorganization. These changes in her work environment were the primary cause of her anxiety and are not the type of 'duties' contemplated by Minn. Stat. § 353E.06, subd. 1.

The staff also disputed the ALJ's conclusion that Hildebrandt had met her burden to prove that her disability was a direct result of an injury that arose out of an act of duty as a jailer/dispatcher. The staff maintained the conclusion was incorrect

because the evidence demonstrated that it was not the nature of the work that Ms. Hildebrandt performed that resulted in her disability. Rather, it was her reaction to the expectations of her supervisors that caused her disability. Since this reaction was not a condition that would arise normally out of her prescribed duties, it should not be considered a qualifying event for purposes of duty-related benefits.

The PERA board then conducted a public hearing in which Hildebrandt participated by phone. During the hearing Hildebrandt testified:

I will be the first to admit that we had a very stressful office with Ron Wendler, when he became employed with us. I wrote in my letters. I said this at my fact-finding hearing. But they keep mentioning personality conflicts, and this I do not understand. What personality conflict and what co-worker did I have that I could have this conflict with? I work by myself, 12 hours a shift, and I always work the night shift. The Sheriff worked days. And Ron Wendler and I always worked opposite shifts.

In response to a board member's question to Hildebrandt why she had not returned to work if she was fine with her supervisors and the ergonomic issues had been resolved, Hildebrandt testified:

> Because I cannot handle 911 calls.... [Y]ou can't imagine what it's like trying to get an address from a person, just a simple address from a person whose husband is suffering from ... a heart attack or a baby can't breathe.... You can't imagine the way I prayed that I wouldn't have to get up in the morning to face them if I made a mistake.

A board member also testified at the hearing:

> I'm having trouble supporting the staff recommendation.... [H]er personal doctor, the medical examiner's office and our independent medical evaluator did state that ... her disability was duty-related. And while I understand the difference between the benefit that would be received, it seems to me that events over a period of time caused a duty-related disability. And also, in the record, it shows where her doctor on several occasions excused her from work for longer than a day or two, and at one point it was actually a week and at another point it was about two weeks. And of course ... when she was away from work she got better. When she returned to work, she ... came back into her other condition after a period of time. And it seems to me that it's absolutely a duty-related disability.

At the end of the hearing, a board member moved that the board "support the staff's recommendation based on their testimony at the meeting today and testimony of [assistant attorney general] Rory Foley." The motion carried with two no votes and Hildebrandt was denied duty-related disability benefits. This appeal follows.

## ISSUES

1. Did the legislature intend to limit duty-related disability benefits under Minn.Stat. § 353E.06, subd. 1(2004), only to those disabilities that were incurred in, or arose out of, an act of duty that is uniquely hazardous to a local-government correctional-facility employee?

2. Was the PERA board's decision to deny Hildebrandt duty-related benefits arbitrary, unreasonable, or unsupported by substantial evidence?

## ANALYSIS

The Minnesota Supreme Court has analogized a public-retirement-fund board to an administrative agency, and so we review the PERA board's decision under the standard used for agency decisions. *Axelson v. Minneapolis Teachers' Ret. Fund Ass'n*, 544 N.W.2d 297, 299 (Minn.1996). As such, we will reverse the PERA board's decision only if it is "fraudulent, arbitrary, unreasonable, unsupported by substantial evidence, not within its jurisdiction, or based on an error of law." *Id.* (quotation omitted). In a challenge to the decision of an administrative agency, requiring this court to construe the words of a statute, we review the statutory interpretation de novo and then consider whether the agency's decision was reasonable in light of the proper meaning of the statute. *Citizens for a Balanced City v. Plymouth Congregational Church*, 672 N.W.2d 13, 19 (Minn.App.2003); *see also St. Otto's Home v. Minn. Dep't of Human Servs.*, 437 N.W.2d 35, 39 (Minn.1989) (stating "[w]hen a decision turns on the meaning of words in a statute or regulation, a legal question is presented").

### I.

Hildebrandt argues that PERA erred in its interpretation of when a disability

arises out of or is incurred in "any act of duty." The PERA board "construe[d] this language together with the different disability benefits outlined in Minn.Stat. § 353E.06, subds. 1, 2 (2004) to limit duty[-related] disability benefits to those hazardous situations envisioned by Minn.Stat. § 353.63 (2004) and not to ordinary personality disputes in the office setting."

■ While conceding that this court is not bound by the board's interpretation of the phrase "act of duty," PERA argues that its determination is entitled to "great weight." We have noted in the past that "[w]hen the meaning of a statute is *doubtful,* courts should give great weight to a construction placed upon it by the department charged with its administration." *Goodnature v. Mower County,* 558 N.W.2d 19, 20 (Minn.App.1997) (quotation omitted) (emphasis added). But when the legislature's intent is ascertainable by considering the meaning of the statutory language in light of general grammatical principles, the meaning is not doubtful and we do not defer to an administrative agency's determination. *St. Otto's Home,* 437 N.W.2d at 39–40; *see also* Minn.Stat. § 645.16 (2004) (stating purpose of statutory interpretation is to discern the intention of the legislature).

■ As a "jailor/dispatcher" for the Lake of the Woods Sheriff's department, Hildebrandt's request for disability benefits falls under ch. 353E (2004), the "Local Government Correctional Service Retirement Plan." Hildebrandt is seeking duty-related disability benefits under Minn.Stat. § 353E.06, subd. 1, which provides:

A local government correctional employee who becomes disabled and physically or mentally unfit to perform the duties of the position as a direct result of an injury, sickness, or other disability that is medically determinable, that was incurred in or arose out of any act of duty, and that renders the employee physically or mentally unable to perform the employee's duties, is entitled to a disability benefit.

■■ In this appeal, we need only determine the meaning of the phrase "act of duty."[2] In ascertaining which acts of duty the legislature intended Minn.Stat. § 353E.06, subd. 1, to cover, we presume the legislature's choice of words indicate its intent. *See Northern States Power Co. v. Comm'r of Revenue,* 571 N.W.2d 573, 575 (Minn.1997) (holding that in construing the meaning and scope of a statute, the words of the statute govern and are given their common and approved usage.). In subdivision 1, the legislature provided that the local correctional employee is entitled to duty-related disability benefits if the injury arose from *any* act of duty. We assume the legislature intended "any" to modify "act of duty." *Cf.* Minn.Stat. § 645.08(3) (stating "general words are construed to be restricted in their meaning by preceding particular words"). "Any" is defined, depending on the context, as "[o]ne, some, every, or all without specification." *The American Heritage Dictionary* 64 (4th ed. 2000). When the word is used "[i]n the affirmative, sentences it means 'every,' or 'all'." Bryan A. Garner, *The Oxford Dictionary of American Usage and Style* 24 (2000). Applying the com-

---

**2.** On appeal, PERA argues that Hildebrandt failed to present sufficient evidence of "the requisite nexus between [her] disability and any hazardous nature of her job." To the extent that PERA is now arguing that Hildebrandt's disability is not a "direct result" of her employment, this argument has never been raised prior to this appeal and any such claim is waived. *See Thiele v. Stich,* 425 N.W.2d 580, 585 (Minn.1988) (holding reviewing court must generally consider only those issues that the record shows were presented and considered below in deciding the matter before it).

mon meaning of "any" to "act of duty," it is clear that the legislature intended a local correctional employee to receive "duty-related" disability benefits for injuries that were directly caused by all tasks or functions required of that employee, without limitation. *See The American Heritage Dictionary* 64 (4th ed. 2002) (defining "duty," among other possibilities, as "service, function, or task assigned to one").

Having determined that the scope of "any act of duty" is clear from the plain meaning of those words, we need not consider PERA's argument that the legislature's policy statement in Minn.Stat. § 353.63 (2004) for the police and firefighter retirement plan should be used to restrict the meaning of "acts of duty" in Minn.Stat. § 353E.06, subd. 1. *See Mutual Service Cas. Ins. Co. v. League of Minnesota Cities Ins. Trust,* 659 N.W.2d 755, 760 (Minn.2003) (stating "where the intention of the legislature is clearly manifested by plain and unambiguous language, [appellate courts] have neither the need nor the permission to engage in statutory interpretation"). We note, however, that there are marked difference between the police and firefighter retirement plan under Minn. Stat. 353.63 353.68 (2004) and the other public employee retirement plans, which would suggest applying the policy statement to any plan other than the police and firefighter retirement plan is not appropriate. For instance, Minn.Stat. 353.63 provides that "benefits provided in sections 353.63 to 353.68 are more costly than similar benefits for other public employees" and that the special benefits are provided to the police and the firefighters in recognition that "this work is hazardous" and that there are "particular dangers inherent in these occupations" that are not present for other public employees covered by other plans.

## II.

Based on the plain meaning of "any act of duty" in Minn.Stat. § 353E.06, subd. 1, we next consider whether the PERA board's decision to deny Hildebrandt duty-related benefits was arbitrary, unreasonable, or unsupported by substantial evidence. The appellant must demonstrate by a preponderance of the evidence that the PERA board's findings are arbitrary, unreasonable, or not supported by substantial evidence. *In re Application of Allers,* 533 N.W.2d 646, 652 (Minn.App. 1995), *review denied* (Minn. Aug. 30, 1995). Substantial evidence is such relevant evidence, considered in its entirety, as a reasonable mind might accept as adequate to support a conclusion. *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 825 (Minn. 1977).

The board, in denying benefits, adopted the PERA staff's conclusion that Hildebrandt's disability was caused by personality conflicts with her employer rather than by the job itself. There is nothing in the record before us that supports this conclusion and PERA points to no evidence that suggests Hildebrandt's disability was simply the result of personality conflicts. It is unclear how Hildebrandt's condition can be the result of personality conflicts with co-workers when it is uncontested that she works the night shift by herself.

In contrast, there is substantial evidence in the record that leads to the conclusion that Hildebrandt's condition was incurred in, or arose out of, an act of duty. Both Dr. Fletemier and Dr. Suvalsky concluded that Hildebrandt's disability was "a direct result of an injury or illness which occurred during, or arose out of, an act of duty." Dr. Suvalsky concluded in her diagnosis that Hildebrandt "was relatively symptom-free for a number of years until she got into a situation at work where

the workload that was expected of her seemed to be above what she was capable of, both in terms of quantity and in terms of skill level." Further, two doctors from the department of health concluded that Hildebrandt was "occupationally disabled." Also, it is undisputed that on Hildebrandt's last day, a computer malfunction disconnected an emergency call before she was able to obtain the needed information and this incident caused her to be dizzy, short of breath, and scared. And as one of the board members pointed out, the record shows that Hildebrandt's condition improved when she was away from work, but when she returned to work her condition was exacerbated. Under these circumstances, a reasonable person could only conclude that Hildebrandt's disability is a direct result of an "act of duty."

## DECISION

Under the unambiguous language of Minn.Stat. § 353E.06, subd. 1, Hildebrandt is entitled to duty-related disability benefits because her disability was the direct result of tasks or functions that she was required to perform as a jailor/dispatcher.

**Reversed.**